Larry **ARCHER**, Appellant,

v.

**SCHNEIDER, BERNET & HICKMAN, INC.**, Appellee.

No. 05–84–01175–CV.

Court of Appeals of Texas, Dallas.

Nov. 13, 1985.

Rehearing Denied Dec. 20, 1985.

Beverly Martin, Dallas, for appellant.

Nina Cortell, Haynes & Boone, Dallas, for appellee.

Before STEPHENS, VANCE and HOWELL, JJ.

STEPHENS, Justice.

Larry Archer, appellant, seeks relief from an adverse judgment in favor of Schneider, Bernet & Hickman, Inc. ("the broker"). In four points of error, appellant contends that the trial court committed reversible error by ignoring the jury's answer to special issue no. 2. We disagree with each point and, accordingly, affirm the judgment of the trial court.

The dispute between the parties arose from a telephone order placed by Archer with the broker. Archer contends that he placed a "limit order" at $1.00 each for 2,000 Texas Instruments put options. The broker contends that Archer ordered the options bought at the market price. In accordance with the broker's understanding of the order placed, the stock was purchased at $17.00 per share. This controversy immediately arose, prompting the broker to sell the stock at the market price for $14.00 per share, creating a loss of $6,000 which, along with the undisputed commission of $548.47, was charged to Archer's account. After Archer refused to pay the account, suit was brought.

Two special issues were submitted to the jury:

SPECIAL ISSUE NO. 1:

Do you find from a preponderance of the evidence that Larry Archer requested that Schneider, Bernet & Hickman purchase, for Archer's account, 20 Texas Instruments puts at market price on June 13, 1983?

Answer "yes" or "no."

ANSWER: yes

SPECIAL ISSUE NO. 2:

What amount of money, if any, do you find would reasonably and adequately compensate Schneider, Bernet & Hickman for Archer's failure to pay for the 20 Texas Instruments puts purchased by Schneider, Bernet & Hickman for Archer's account on June 13, 1983?

Answer in dollars and cents.

ANSWER: $2,182.81.

On motion of the broker to disregard the answer to special issue no. 2, the trial court rendered judgment in favor of the broker for the sum of $6,548.47.

In four points of error, Archer contends that the trial court erred by disregarding the jury's answer to special issue no. 2 by contending first, that the issue is supported by the evidence; that the two issues fatally conflict with each other; that the court's supplemental finding involved a different ground of recovery than that submitted to

the jury; and finally, that no evidence supports the court's supplemental finding as to the sum due.

 All of these points of error may be addressed in a single response. The answer to special issue no. 1 was a finding by the jury that Archer had contracted with the broker to purchase the stock in question for his account at the "market price." The answer to special issue no. 2 was a finding of the amount of money Archer owed the broker for such purchase. No conflict exists between the answer to the special issues because special issue no. 2 did not inquire whether Archer's order imposed a limitation on the order, nor can it be construed as a finding that he did impose such limitation. It being undisputed that Archer had made no payment on the account, the only remaining fact to be determined was the market price of the stock, when purchased and when sold on the day in question, and the commission due the broker. The evidence on these matters was undisputed, and the sum due the broker was subject to a mathematical computation. *Wright v. Vernon Compress Co.*, 156 Tex. 474, 296 S.W.2d 517, 523 (1956); *Tennell v. Esteve Cotton Co.*, 546 S.W.2d 346, 357 (Tex.Civ.App.—Amarillo 1976, writ ref'd n.r.e.). It is readily apparent that the evidence upon which the jury based its answer to special issue no. 2 was not probative of "market value." We need not speculate on what reasoning led the jury to conclude the market value was $2,182.81 when the undisputed evidence established a higher value. We need only hold, and we do hold, that the trial judge properly disregarded the answer to special issue no. 2 because of a lack of evidence to support it and that the trial court properly rendered judgment on the answer to special issue no. 1 for the market value established by the undisputed evidence.

The judgment of the trial court is affirmed.

HOWELL, J., dissents.

HOWELL, Justice, dissenting.

I dissent. The majority has confused the concepts of "no evidence" and "immaterial evidence." To hold that evidence ceases to exist once it is determined to be immaterial is leger-demain—Alice-in-Wonderland logic. There is ample evidence to support the jury's answer to the second issue, immaterial or not. Hence, a conflict exists. That evidence only becomes immaterial if we give primacy to the finding under the first issue that Customer Archer agreed to pay "market price." The logic employed by the majority has assumed that which it has set out to prove.

Conflicts may be disregarded for immateriality only if the *entire* conflict is immaterial. That is to say, the conflict becomes immaterial and may be disregarded only if the judgment would remain unaffected either way the conflict may be resolved. *Little Rock Furniture Mfg. Co. v. Dunn*, 148 Tex. 197, 222 S.W.2d 985, 991 (1949).

In the present case, if the first issue were disregarded, one judgment would be required and if the second issue were disregarded, another judgment would be mandated. The entire conflict may not be declared immaterial as in *Dunn* and the case must be remanded for a new trial before another jury.

The case before us turned on a simple factual conflict. Archer contended that he placed a "limit order" of $1.00 each for 2,000 Texas Instruments put options, a fixed price bid for the securities in question. When a limit order is placed and no one desires to sell for that bid, no transaction results.

Conversely, the broker claims that Archer placed a "market order" giving the broker authority to send its agent to the floor of the marketplace for the purpose of buying on the customer's behalf at the best available price. When a market order is placed, the customer is fairly well-assured that his order will be filled promptly, but the price to be paid may fluctuate above or below the previous sale quotation available in the broker's office, the financial section of the newspapers and elsewhere.

Although it was not submitted to the jury in such manner, and it would not be customary to do so, the essential question before the jury was: whose version of the transaction is the correct one? The first of two issues submitted by the trial court inquired whether Archer had instructed the broker to buy the put options "at market price." The jury answered "yes." The broker's version was found to be correct. Admittedly, if this were the only issue to be answered, the amount due to the broker would be mere calculation.[1]

However, the jury refused to apply plain arithmetic in its answer to special issue two. Instead, it answered $2,182.92. This sum undoubtedly reflects the jury's acceptance of Archer's contention that he gave the broker a "limit" order of $1.00 per share option; it found the customer's version to be correct. The charges and expenses were also reduced in the same exact proportion as the principal claim.

In weighing the question whether issue two can be disregarded on no evidence grounds, we must look at the evidence in the light most favorable to the verdict. *McClure v. Casa Claire Apartments, Ltd.*, 560 S.W.2d 457, 460 (Tex.Civ.App.—Beaumont 1977, no writ). Steve Swenson, an associate of Schneider Bernet, normally handled Archer's account. Archer testified that he spoke to a woman he believed to be Steve Swenson's secretary at 8:30 A.M. on June 13, 1983. Archer stated that he merely requested information from this woman; he did not place an order. He further testified that he left a message for Swenson to call him. Later, Archer spoke to Swenson and ordered twenty Texas Instruments put option contracts at a limit of $1.00 per share option, a total of $2,000. Archer testified that in the past he had normally been willing to risk only $500 to $800 on option purchases. Archer acknowledged that he also anticipated paying the broker's usual commission. In answering special issue number two, the jury implicitly but necessarily found that Archer gave a limit order in the amount of $2,000 plus commission charges.[2] We can no more reject customer Archer's credibility on a no evidence point then we can reject the credibility of the broker's witnesses. Issue two cannot be disregarded on no evidence grounds.

Reading the verdict in light of the evidence, it is clear that in one instance, the jury essentially declared "we believe the broker's version" and in the other, necessarily declared "we believe the customer's version"—a direct and irreconcilable conflict.

A trial court may properly disregard a conflicting jury finding upon a special issue only if there is no evidence to support the

1. The broker's invoices reflect that the 2,000 share options were purchased for $17 per option and that, when the transaction was disputed, the broker re-sold for $14 per option, a loss of $3 on each option—amounting to a total loss of $6,000. The invoices also reflect commission and expense charges of $548.47 bringing the total claim to $6,548.47. Inasmuch as the veracity of the invoices was unchallenged, the only damage figure consonant with the first issue would be $6,548.47.

2. The broker argues that there is no evidence from which the jury could have determined that $182.82 was a reasonable amount for its commission and incidental charges had the securities been bought for $1.00 each. From this premise, it argues for the disregard of issue two, because, in its view, there is no evidence to support $182.82 of the $2182.82. Neither the premise nor the conclusion is well founded. The broker itself presented uncontroverted testimony that $548.47 was a reasonable amount for a "daylight round turn" when the same quantity of the identical security was bought at $17 and re-sold at $14. The sales representative for the broker testified that the amount of the commission was basically a function of the price per option and the number of options bought. Obviously responding to this testimony, the jury reduced the commission claim by exactly two-thirds when it reduced the principal claim by two-thirds.

Inasmuch as the broker produced evidence of reasonableness at the $6,000 level and offered testimony indicating that a sliding scale method of computing charges is reasonable, there is some evidence from which the jury could have decided that prorating according to the dollars involved was fair compensation. Furthermore, in light of the whole amount in controversy, any discrepancy between the broker's actual commission schedule and the amount found by the jury would be de minimus.

answer. Even if the finding is upon an issue that is claimed to be immaterial, if the issue creates a fatal conflict with other findings or otherwise affects the legal significance of the verdict, the issue cannot be disregarded for immateriality and the conflict cannot be ignored. *C & R Transport Inc. v. Campbell*, 406 S.W.2d 191, 194 (Tex. 1966).

The procedure for identifying conflicts in jury answers is well established.

> "The test in such (a) case is, whether taking the finding alone in the one instance, a judgment should be entered in favor of the plaintiff; and taking it alone in the other, judgment should be entered in favor of the defendant...."

To apply this test, the court must consider each of the answers claimed to be in conflict, disregarding the alleged conflicting answer but taking into consideration all of the rest of the verdict, and if, so considered, one of the answers would require a judgment in favor of the plaintiff and the other would require a judgment in favor of the defendant than the answers are fatally in conflict. It is essential that the party seeking to set aside a verdict on the grounds of conflict must be able to point out that one of the conflicting answers of the jury, in connection with the rest of the verdict except the issue with which it conflicts, necessarily requires the entry of a judgment different from that which the court has entered.

*Dunn*, 222 S.W.2d at 991.

Had the first issue been the only one submitted, judgment for the plaintiff broker's full claim would have been proper because (as the majority holds), the amount of the claim would have been mere calculation. Had the second issue been the only one submitted, there would have been an irregular submission, but, lacking a timely objection, it would have supported a judgment for the customer because it clearly indicated that the jury agreed with his version of the dispute. There is no distinction from *Dunn*, and the case must be reversed.[3]

Apparently, the majority would dispose of the conflict by terming the second issue immaterial—an unacceptable resolution. An issue claimed to be immaterial cannot be disregarded if it creates a fatal conflict or otherwise affects the legal significance of the verdict. *C & R Transport*, 406 S.W.2d at 194.[4]

The majority's approach leads to absurd results. The second issue is disregarded because it is inconsistent with the first. But there is no reason why the first issue should not be disregarded in deference to the second. The majority's resolution of the case would seem to make whatever

3. Appellee broker urges that *Dunn* requires a judgment in its favor because the plaintiff's judgment in that case was upheld *in spite of* the conflicting issues. In *Dunn*, a vehicle injury case, the trial court submitted contributory negligence in a series of three issues, a fact issue, a negligence issue and a proximate cause issue, each conditioned upon an affirmative answer to the preceding. The answers to the fact issue and the negligence issue were admittedly conflicting, but the jury failed to answer the proximate cause issue at all and there was no timely objection. The distinction between *Dunn* and the case at hand is that the failure in that case to obtain a proximate cause finding created a situation where *neither of the conflicting issues could have had any bearing whatever on the terms of the judgment*. The existence of the conflict was not the core issue. The heart of the matter was the effect of the conflict. The case before us is a different species. Special issue number two, if submitted by itself would have completely vindicated appellant Archer's position; he would have won. *Dunn* is not distinguishable; it is controlling.

4. The majority cites only two cases. *Wright v. Vernon Compress Co.*, 156 Tex. 474, 296 S.W.2d 517 (1956) stands for the well recognized proposition that no issue need be submitted upon any point where the evidence is clear and undisputed. *Tennell v. Esteve Cotton Co.*, 546 S.W.2d 346 (Tex.Civ.App.—Amarillo 1976, writ ref'd n.r.e.) involves a situation where the trial court disregarded a damage issue because the damages were determinable by reading the contract in light of the undisputed evidence. Held: the issue "has no support in the evidence." Any resemblance to the case at hand is superficial because there was no claim there made that one *jury finding* conflicting with another *jury finding*. The majority presents no authorities on conflicting jury findings—the only real issue before us.

finding first appears in the charge into the controlling finding. Neither logic nor law sanctions such an ordinal approach. Certainly the cases cited by the majority do not do so, but in any instance the Supreme Court decisions would control.

The majority strives to give effect to the verdict by arbitrarily disregarding the second issue. The trial court need not have submitted it but the fact remains—it was submitted. Its submission led to an undeniable conflict.

Viewed in the light of the evidence, as must be done, the jury's answer to number one irrevocably implies a finding that Archer agreed to pay the prevailing price, whatever it may be. Conversely, the answer to number two just as irrevocably implies a finding that Archer had notified the broker that he would not buy at all unless the securities could be obtained for one dollar each, or less. Obviously, the jury did not comprehend the charge. We do not know what the jury intended. This inexplicable conflict reduces the verdict to a shambles, a nullity.

A judgment stemming from such a verdict is inconsistent with justice and good practice. Consequently, I dissent. The judgment should be reversed and remanded.