**COLORADO INTERSTATE GAS
COMPANY, Appellant,**

v.

**HUNT ENERGY CORPORATION,
et al., Appellees.**

No. 07–98–0090–CV.

Court of Appeals of Texas,
Amarillo.

June 27, 2000.

Opinion Overruling Rehearing
Aug. 14, 2000.

Andrews & Kurth, L.L.P., Lori Meghan Gallagher, Houston, Carr, Hunt & Joy, Donald M. Hunt, Lubbock, for appellant.

Donohoe, Jameson & Carroll, Richard M. Hunt, Jeanne Huey Erickson, Dallas, for appellees.

Before BOYD, C.J., and QUINN and JOHNSON, JJ.

JOHN T. BOYD, Chief Justice.

In this dispute between parties to a gas purchase agreement, Colorado Interstate Gas Company (hereinafter "CIG") appeals from a judgment rendered against it awarding Hunt Energy Corporation, et al., damages based upon CIG's failure to pay the correct price for gas taken pursuant to a Gas Purchase Agreement (hereinafter "GPA") and for failure to make requisite take or pay payments.[1]

In three issues, CIG claims that the trial court erred as follows: (1) in submitting an issue to the jury regarding the intent of the parties with respect to pricing under the contract insofar as the contractual terms were unambiguous; (2) alternatively, that if the terms of the contract were ambiguous, in failing to specifically identify the ambiguous terms and in failing to instruct the jury with respect to federal law governing gas pricing; and (3) in awarding judgment against CIG because the Hunts failed to establish ownership of the property interests covered by the GPA.

The Hunts, as cross-appellants, present four issues in which they claim the trial

1. The plaintiffs at trial were Hunt Petroleum Corporation, Hassie Hunt Exploration Company, Hassie Hunt Production Company, Petro–Hunt Corporation, Johnson Southwest, Inc. (formerly Hunt Energy Corporation), Prosper Energy Corporation, Rosewood Resources, Inc., Propel Energy Company, the Nelson Bunker Hunt Trust Estate, the William Herbert Hunt Trust Estate, the Lamar Hunt Trust Estate, and the Lyda Hunt–Bunker Trust for the Benefit of Mary Moreland Hunt. For purposes of this appeal, those entities will be hereinafter collectively referenced as "the Hunts."

court erred as follows: (1) in awarding CIG certain "equitable make-up rights" contrary to the agreement and the law; (2) in denying the Hunts' attorney's fees as found by the jury; (3) in denying the Hunts' motion for judgment notwithstanding the verdict concerning the jury's finding of ownership with respect to the G.C. Davis 1–61 well; and (4) in refusing to enter judgment nunc pro tunc as of December 24, 1996, the date of the trial court's original judgment in the case. For the reasons expressed herein, we modify the judgment and, as modified, affirm it.

On November 9, 1978, Congress enacted the Natural Gas Policy Act of 1978 ("NGPA"), 15 U.S.C.A. §§ 3301 *et seq.* (1998),[2] creating various categories of gas and also creating a system of phased deregulation of gas prices by category. For the purposes of addressing the issues raised by this appeal, the relevant provisions of the NGPA provided as follows:

§ 3311(b) RULES OF GENERAL APPLICATION. -

\* \* \*

(5) SALES QUALIFYING UNDER MORE THAN ONE PROVISION.—If any natural gas qualifies under more than one provision of this title providing for any maximum lawful price or for any exemption from such a price with respect to any first sale of such natural gas, the provision which could result in the highest price shall be applicable.

\* \* \*

(9) EFFECT ON CONTRACT.—In the case of-

(A) any price which is established under any contract for the first sale of natural gas and which does not exceed the applicable maximum lawful price under this title, or

(B) any price which is established under any contract for the first sale of natural gas which is exempted under subtitle B of this title from the application of a maximum lawful price under this title such maximum lawful price, or such exemption from such a maximum lawful price, shall not supersede or nullify the effectiveness of the price established under such contract.

CIG is an interstate natural gas pipeline company that purchases natural gas and sells it to consumers. On January 15, 1980, in accordance with the terms of a Joint Venture Agreement, CIG entered into a GPA to purchase natural gas from some of the Hunts.[3] The agreement originally gave CIG the exclusive right to purchase gas produced from the E.T. Davis 1–65 well in Wheeler County, but was later amended to add two more wells, the E.T. Davis 1–60 and the G.C. Davis 1–61. For convenience, the wells will be hereinafter referenced collectively as the Davis Wells. In exchange for the exclusive purchase right, CIG agreed to a take or pay provision in the GPA, which required CIG to take the contract quantity from each well, or if it took less, then to pay for the gas not taken. If CIG timely paid the take or pay amount for any year, it was permitted to take "make-up gas" without cost during the next five years.

Gas deliveries to CIG began as follows: Well 1–65 on April 1, 1980; Well 1–60 on November 5, 1980; and Well 1–61 on July 1, 1981. All three wells were dually qualified as § 102 "new" gas, which was regu-

---

**2.** Pub.L. 95–621 (1978), 92 Stat. 3350. Sections 3311 to 3320 were repealed by Pub.L. 101–60 (1989), 103 Stat. 158.

**3.** There were subsequent assignments from some of the original parties to the GPA.

lated at the time of initial deliveries, and as § 107(c)(1) "deep" gas, which had been deregulated on November 1, 1979. From the time of initial deliveries until January 1984, CIG paid the § 102 price. Early in 1984, in light of a sharp decline in the natural gas market, CIG approached the Hunts regarding a renegotiation of the gas price. When the Hunts refused to renegotiate, CIG refused to take the full contract quantity of gas or to make the take or pay payments. However, CIG did continue to take some gas from the wells and continued to pay the § 102 price for the gas so taken. In December 1984, the price for § 102 gas deregulated. From 1985 until 1988, in accordance with Paragraph 5.1(b) of the GPA, CIG paid for the gas taken from the wells based upon the December 1984 § 102 price for an additional year and then paid that price increased by 1½ cents per Mcf per year.

On February 2, 1988, the Hunts filed suit against CIG for negligent performance of contract, which was subsequently amended to include claims for breach of contract. CIG counterclaimed in subsequent pleadings for, among other things, unjust enrichment, breach of contract and conversion. Beginning September 1, 1988, CIG suspended payments under the contract based upon alleged title questions concerning the Davis Wells. No additional payments were made from CIG to the Hunts until 1994, when the parties agreed to a payment of suspended funds based upon a lower rate pending resolution of the litigation between them.

The case was tried to a jury, which returned with a verdict on January 31, 1995. In response to the jury's verdict, a judgment was entered by the trial court on December 24, 1996, after two mandamus proceedings filed by the Hunts. That judgment was vacated on March 6, 1997, and a final judgment was entered on De-cember 10, 1997. Judgment was rendered for Hunt Petroleum Corporation, Hassie Hunt Production Company, Petro–Hunt Corporation, and the Lamar Hunt Trust Estate for underpayment of the price of gas taken by CIG and for unpaid take or pay claims including prejudgment interest. CIG was awarded equitable make-up rights to the gas. It is from this judgment that the parties appeal.

The parties' primary dispute centered around interpretation of the pricing provisions contained in the GPA, within the context of the NGPA, interpretive federal regulations, and the Supreme Court case of *F.E.R.C. v. Martin Exploration Co.*, 486 U.S. 204, 108 S.Ct. 1765, 100 L.Ed.2d 238 (1988). Three provisions of the GPA bear upon this dispute regarding the appropriate price for gas either taken or declined from the Davis Wells. As pertinent, those provisions are:

\* \* \*

ARTICLE V PRICE

5.1(a) For all gas delivered to Buyer, Buyer shall pay Seller the ceiling prices, including all adjustments and escalations, applicable to the gas covered by this Agreement, as established by the Federal Energy Regulatory Commission or other federal or state governmental authority having jurisdiction (FERC), or under the Natural Gas Policy Act or any amendment or successor legislation thereto. The price shall change to conform to all such adjustments and escalations on the date they become effective as to the gas covered hereby. . . .

(b) In the event the regulation of the price at which natural gas is sold under this Agreement ceases, then the price hereunder in effect immediately prior thereto shall continue in effect for a period of 1 year from the date such regulation ceases; and for each succes-

sive 1–year period thereafter, the price shall increase 1–½ cents per Mcf above the price for the preceding period, ...

\* \* \*

ARTICLE VII REGULATIONS

7.1 RULES AND REGULATIONS—The Agreement and the respective obligations of the parties hereunder are subject to present and future valid laws and valid orders, rules, and regulations of duly constituted authorities having jurisdiction or control over the parties, their facilities or gas supply, or this Agreement or any provision thereof; but on the cessation of any such jurisdiction or control, all rights and obligations as set forth in this Agreement shall again pertain.

As previously noted, the NGPA contained a provision for pricing of gas qualifying for more than one category, which provides, "[i]f any natural gas qualifies under more than one provision of this subchapter providing for any maximum lawful price or for any exemption from such a price with respect to any first sale of such natural gas, *the provision which could result in the highest price shall be applicable.*" 15 U.S.C.A. § 3311(b)(5) (emphasis added). It is this provision, including its interpretation by the Federal Energy Regulatory Commission (hereinafter "FERC") and ultimately the United States Supreme Court, and the effect it has upon this contract that is central to resolution of the dispute between the parties.

The FERC issued a rule in 1984 which interpreted this provision to mean that any gas that qualified as both deregulated and regulated would be treated as deregulated gas from the first date of deregulation. 18 C.F.R. § 270.208 (1986).[4] This interpretation was appealed to the Tenth Circuit

Court of Appeals which adopted the position that the provision requires the applicable category to be that which, at any particular moment, results in the producer receiving the highest contract price for its gas. *Martin Exploration Management Co. v. F.E.R.C.,* 813 F.2d 1059, 1068–69 (10th Cir. 1987). On further appeal, the United States Supreme Court reversed the opinion of the Tenth Circuit, and found in accordance with the FERC interpretation. *Martin,* 486 U.S. at 209, 108 S.Ct. 1765.

The Hunts, as sellers under the GPA, argued that in light of the uncertainty surrounding the federal deregulation of natural gas, the agreement of the parties provided for a "compromise" price to be produced from these wells "benchmarked" to the § 102 ceiling price. They claimed that the terms of the contract, insofar as they governed the sale of dually qualified gas, effectively required payment of the ceiling price, as long as any ceiling price was applicable. Only when the last category under which the gas qualified had deregulated would the deregulated pricing provision of the contract be applicable. Accordingly, the Hunts asserted that although at the time each of the Davis Wells came on line, the price for § 107 deep gas was already deregulated, the regulated § 102 price was applicable and continued to control until § 102 gas deregulated in December 1984.

CIG responded by claiming that prior to 1988, the parties were operating under the industry wide misconception that the applicable price for dually qualified gas was the category which actually resulted in a higher price, whether regulated or deregulated, depending on the particular contract, thus explaining why it continued to pay the § 102 price. As support for its position of a reduction in price, CIG raised the Su-

4. 18 C.F.R. § 270 was removed at 59 FR 54128 (1994).

preme Court's definitive interpretation in *Martin*, which stated that when gas is dually qualified under both a regulated and a deregulated category, the deregulated provision controls. *Id.* CIG claimed that because each of the wells qualified as § 107 and § 102 gas, and because § 107 gas was deregulated prior to the execution of the GPA, then in accordance with 5.1(b), the last regulated price of § 107 gas governed the contractual price. It asserted, therefore, that the parties should look to the October 31, 1979 regulated price of § 107 deep gas as the "price hereunder in effect immediately prior" to deregulation, and utilize that price for determining payment obligations.

Although neither party asserted that the contractual terms were ambiguous, the trial court concluded that an ambiguity did exist with respect to the pricing provisions and submitted an issue to the jury regarding the intent of the parties as to pricing for gas obtained from the Davis Wells. That issue, as given to the jury, states in its entirety:

> What was the intent of the parties to the Gas Purchase Agreement as to the price that CIG would pay for gas delivered from the Davis Wells pursuant to said agreement?

> Select one of the following by circling your choice:

> 1. the NGPA Section 102 price until deregulation of that price on January 1, 1985, and then the last regulated price plus 1.5 cents per year;

> OR

> 2. the highest price, whether determined under a regulated or deregulated pricing category, applicable to the gas under federal law; the deregulated price would be the last applicable regulated price plus 1.5 cents per year.

## INSTRUCTIONS

1.1 The answer you select must be based upon a preponderance of the evidence.

1.2 In answering Question No. 1, it is your duty to interpret paragraphs 5.1(a) and 5.1(b) of the Contract, and all other relevant contract provisions, based on the other instructions previously given to you.

The jury responded by selecting choice one, which may be fairly said to represent the position taken by the Hunts. CIG now claims that the trial court erred in submitting such an issue for the jury's determination because the contract unambiguously supports its interpretation which it claims must be followed in light of *Martin.*

Courts should construe a contract from a utilitarian standpoint, bearing in mind the particular activity sought to be served. *Lenape Resources Corp. v. Tennessee Gas Pipeline,* 925 S.W.2d 565, 574 (Tex.1996). In so doing, meaning should be given to each contractual provision, but courts should avoid strained rules of construction that would avoid ambiguity at all costs. *Id.; Reilly v. Rangers Management, Inc.,* 727 S.W.2d 527, 530 (Tex.1987).

Whether a contract is ambiguous is a question of law that must be decided by examining the contract as a whole in light of the circumstances present when the contract was entered. *Columbia Gas Trans. Corp. v. New Ulm Gas,* 940 S.W.2d 587, 589 (Tex.1996); *National Union Fire Ins. Co. v. CBI Industries, Inc.,* 907 S.W.2d 517, 520 (Tex.1995); *Coker v. Coker,* 650 S.W.2d 391, 394 (Tex.1983). A contract is not ambiguous if it can be given a definite or certain meaning as a matter of law. *Columbia,* 940 S.W.2d at 589; *National Union,* 907 S.W.2d at 520; *Coker,* 650 S.W.2d at 393; *Universal C.I.T. Credit Corp. v. Daniel,* 150 Tex. 513, 243

S.W.2d 154, 157 (1951). An ambiguity does not arise simply because the parties advance conflicting interpretations of the contract. *Forbau v. Aetna Life Ins. Co.,* 876 S.W.2d 132, 134 (Tex.1994); *Sun Oil Co. (Delaware) v. Madeley,* 626 S.W.2d 726, 727 (Tex.1981). On the other hand, if the contract is subject to two or more reasonable interpretations after applying the pertinent rules of construction, the contract is ambiguous, and creates a fact issue as to the parties' intent. *Universal,* 243 S.W.2d at 157; *see also National Union,* 907 S.W.2d at 520.

■■ At the time the parties executed the GPA, the NGPA was effective. Courts presume the parties to a contract knew and took into consideration the laws affecting matters about which they contracted, unless the contrary clearly appears in the terms of the contract. *Houston Lighting & Power Co. v. Atchison, Topeka & Santa Fe Railway Co.,* 863 S.W.2d 141, 146 (Tex. App.—Texarkana 1993), *rev'd on other grounds,* 890 S.W.2d 455 (Tex.1994). At the time of execution of this contract, § 107 gas was already deregulated. However, § 102 gas would remain statutorily regulated until 1985. Regardless of whether the parties could ascertain with any degree of certainty whether and what type of gas would be produced from these wells, the potential for dual qualification as both regulated and deregulated gas existed. In that light, we must decide whether, by looking to the instrument, the parties intended for the pricing scheme set forth in 5.1(a) and 5.1(b) to address the situation or whether the contract does not account for that possibility.

Section 5.1(a) states, "[f]or *all* gas delivered to Buyer, Buyer shall pay Seller the *ceiling prices*... as established by the Federal Energy Regulatory Commission. . . ." (Emphasis added). The question becomes whether the parties intended to look only to the ceiling prices or did they intend to incorporate the entire deregulatory scheme. We believe only one of these constructions is reasonable and will stand in harmony with section 5.1(b). In its plain ordinary meaning, the provision appears to mean that for so long as a ceiling price is applicable, it is to be paid. This construction dovetails with 5.1(b), which provides that, "[i]n the event the *regulation* of the *price* at which natural gas is sold under this agreement ceases, . . . ." (Emphasis added). One provision determines pricing while the gas is subject to any regulation, the other determines pricing when regulation ceases.

We recognize that this construction validates a contract that provides for pricing which is inconsistent with the Supreme Court's interpretation of the dual qualification provision of the NGPA via *Martin.* In fact, CIG claims that the Hunts are wrong precisely because section 7.1 of the contract requires recognition of valid laws and orders, and by virtue thereof, § 101(b)(5) of the NGPA determines when the applicable ceiling price ceased. Although the Supreme Court stated that the language of § 101(b)(5) means given a dual qualification, in which one category is regulated and one is deregulated, the deregulated provision controls, *Martin,* 486 U.S. at 209, 108 S.Ct. 1765, that section must be read in harmony with the other sections of the NGPA. Section 101(b)(9) states that neither a ceiling price nor an exemption (deregulation) will supersede or nullify the effectiveness of a contractually established price except when the contractual price is above an established ceiling price. 15 U.S.C. § 3311(b)(9) (1998). Thus, as under these circumstances, where one price is deregulated and one price is in accord with the ceiling price, the contractual price stands. It appears then, that our construction of this contract allows full effect

to be given to the contractual terms, as well as recognition of each of the applicable provisions of the NGPA.

In sum, we agree with the parties that the terms of the contract, when read in the context of the law existing at the time of its execution, are unambiguous. However, inasmuch as this court's construction of the pricing terms yields an interpretation that is consistent with that found by the jury, any error in submitting the issue is harmless and does not require reversal. The first issue is overruled.

CIG pleads its second issue alternatively to a finding under its first issue that the contract is ambiguous. CIG contends that if the GPA is ambiguous, an issue should have been submitted to the jury as to specific terms of the GPA which are ambiguous, and the jury should have been instructed with respect to federal law governing gas pricing. We have determined that the GPA was not ambiguous, but that no reversible error occurred by submission of this issue to the jury. It is therefore not necessary for us to address the instructions to the jury in this regard. CIG's second issue is overruled.

In its third issue, CIG contends that judgment should not have been awarded against it because the Hunts failed to establish the ownership of the property interests as provided for in the GPA. In this respect, CIG argues that there was no competent evidence introduced to support the jury's answer to Question No. 2 regarding the current ownership in the Davis Wells, and because the Hunts were in breach of the contract by failing to provide evidence of title, they have no right of recovery against CIG.

CIG initially relies on the proposition that a party to a contract who is in default may not maintain an action on that contract. We note that this lawsuit was filed on February 2, 1988, and CIG did not suspend payments due to uncertainty over the ownership of the property interests until September 1, 1988. Further, there was testimony that up until that time, CIG had been making full payment to the operators of the Davis Wells who were then responsible for distributing payments to the persons or entities so entitled.

The GPA provides in relevant part:

ARTICLE VI TITLE

6.1 Seller shall, within 30 days after Buyer's request, exhibit to Buyer such evidence of its title to its gas rights as shall, in the opinion of Counsel for Buyer, show that it is the lawful owner thereof and of the rights herein described and is in a position to commit such rights to the use of the Agreement. Buyer's Counsel shall have 60 days after the delivery to it of such evidence of title in which to examine same, and should, in the opinion of Buyer's Counsel, Seller fail to exhibit such title, Seller shall have 90 days in which to remedy any specific defects, after having received the notice thereof. If such defects are not so remedied in the time herein given, Buyer at its option may, by notice given to Seller, avoid all obligations in respect to said acreage, the title of which is in question, for wells drilled thereon until such time as Seller shall have remedied the specific defects, after which Buyer's obligations shall resume.

It is generally true that a party to a contract who is in default may not maintain a suit for its breach. *Houston County v. Leo L. Landauer & Associates, Inc.*, 424 S.W.2d 458, 464 (Tex.Civ.App.—Tyler 1968, writ ref'd n.r.e.); *Green v. A.R. Clark Inv. Co.*, 363 S.W.2d 802, 815 (Tex. Civ.App.Fort Worth 1962), *rev'd on other grounds*, 375 S.W.2d 425 (Tex.1964). However, this principle prevents the party who first breaches the contract from then

complaining about the subsequent failure of the other party to perform. *Presley v. Cooper,* 278 S.W.2d 237, 241 (Tex.Civ. App.—Amarillo 1955), *rev'd on other grounds,* 155 Tex. 168, 284 S.W.2d 138 (1955). In the case at bar, CIG attempts to set up the alleged subsequent breach of the Hunts in failing to provide the requested evidence of title as a defense to its own alleged initial breach of the contract.

■ In determining materiality of a breach, courts may consider the extent to which the nonbreaching party is deprived of the benefit that it could have reasonably anticipated from full performance, and the less the party is deprived, the less material the breach. *Herter v. Wolfe,* 961 S.W.2d 1, 4 (Tex.App.—Houston [1 st Dist.] 1995, writ denied). Significantly, the very terms of this particular contract fail to forever relieve the buyer from the obligation to take or pay for gas under the GPA in these circumstances. The contract merely postpones that obligation until after questions of ownership are resolved. *See also Gulf Pipe Line Co. v. Nearen, et al.,* 135 Tex. 50, 138 S.W.2d 1065, 1068 (1940, opinion adopted). Even assuming arguendo that the Hunts breached the contract, we fail to see how CIG has been damaged, since CIG chose to avail itself of the protection afforded it under the GPA by suspension of payment. We therefore do not believe that CIG is entitled to relief from liability for its own breach of the GPA under these circumstances.

■ CIG also contends that expert testimony by way of opinion is not legally sufficient to prove ownership, and that the "best evidence" rule applies where title is at issue, *i.e.,* the only acceptable proof of title is certified title documents, such as leases or assignments, from appropriate land records. The cases cited by CIG are those where title to real property was the central issue of the case, such as trespass to try title, eminent domain, suit for possession and title, etc.

■ Once oil or gas has been severed from the ground, it becomes personalty. *Rogers v. Ricane Enterprises, Inc.,* 930 S.W.2d 157, 165 (Tex.App.—Amarillo 1996, writ denied). CIG's own expert testified that there is a difference between taking an assignment of an oil and gas interest and taking an assignment of the claims that are related to that property. Ownership of the right to payment for gas sold to CIG is pertinent in this case as it relates to the amount of damages, if any, recoverable by the Hunts. In *Elliott v. Langham,* 60 S.W.2d 287, 289 (Tex.Civ.App.—Waco 1933, no writ), the court found that recitals of ownership in a contract for the drilling of an oil and gas well were sufficient to prove title because title was a collateral fact bearing on the measure of damages. Where the issue of ownership is only collaterally related to the issues at trial, the "best evidence" rule does not apply. *Prudential Insurance Company v. Black,* 572 S.W.2d 379, 380 (Tex.Civ.App.—Houston [14 th Dist.] 1978, no writ).

Both CIG and the Hunts produced expert testimony at trial as to ownership of the interests. Both experts had also examined various underlying documents of title, such as leases and assignments, in arriving at their opinions. We believe that this testimony and the summaries admitted in accordance with Texas Rule of Evidence 1006 was evidence which the jury could use in determining ownership of the gas sold to CIG.

Although the case of *R.J.B. Gas Pipeline Co. v. Colorado Interstate Gas Co.,* 813 P.2d 14 (Okla App.1990) [5] is not bind-

5. The Oklahoma Supreme Court rejected the opinion on other grounds in *Taylor v. Chubb*

ing on this court, we address it here with respect to this issue because it is cited to us by the Hunts in support of their first issue discussed below. The court in that case, which also involved a dispute over a take or pay contract, held that the plaintiffs had to prove they were signatories to the contract or assignees of signatory parties because the judgment apportioned damages to each individual plaintiff. The court refused to accept summaries of the division of interests in each well, but accepted uncontested oral testimony by some owners as to their ownership without requiring written documentation. *Id.* at 20.

In the case at bar, the judgment of the trial court was rendered jointly in favor of Hunt Petroleum Corporation, Hassie Hunt Production Company, Petro–Hunt Corporation, and the Lamar Hunt Trust Estate. Other Hunt plaintiffs received no judgment in their favor based on a jury verdict that they owned no interest in the wells. The Hunts' witness Steven Payte testified that he was the title records manager for Hunt Energy Corporation, and testified as to the interests owned by the Hunts by virtue of reviewing documents in the files of a number of the Hunts. Because of the difference in the manner in which the judgment was rendered and the testimony as to ownership by a Hunt employee, we do not believe that the case at bar is necessarily inconsistent with *R.B.J. Gas Pipeline,* although, as we have noted, that case has no precedential effect on this court under any circumstances.

We distinguish also the case of *Lone Star Gas Co. v. Lively Energy & Development Co.,* No. 04–87–00261–CV (Tex. App.—San Antonio, October 11, 1989, writ denied), an unpublished opinion cited by CIG, in which the take or pay contract specifically provided that if the Seller did not own its warranted interest, "then in addition to any other remedies to which buyer may be entitled, Buyer [Lone Star] shall have no obligation to take or pay for any minimum volume of gas under this contract." That specific language does not appear in the GPA in the case at bar.

We further note that plaintiffs and CIG entered into an agreement dated June 10, 1994, in which they warrant a specified interest in each of the Davis Wells as of the date of the agreement. The jury found ownership in the Hunts for the E.T. Davis 1–65 well and the E.T. Davis 1–60 well to be in the same amounts as set forth in that agreement. The jury found ownership to be in lesser amounts for the Hunts in the G.C. Davis 1–61 well than set forth in that agreement. Therefore, it appears that the Hunts did not obtain a larger portion than they may have been entitled to by the jury findings. CIG's third issue is overruled.

As cross-appellants, the Hunts claim in their first issue that the court erred in awarding CIG make-up rights to gas under the GPA contrary to the express terms of the GPA and the law. We agree. As part of the judgment rendered by the trial court, CIG was awarded equitable make-up rights with respect to future production purchased pursuant to the GPA to continue for five years from the first day of the first month following the month that the judgment becomes final and non-appealable. The GPA provides in relevant part:

ARTICLE IV–QUANTITY

\* \* \*

4.2 FAILURE OF BUYER TO TAKE CONTRACT QUANTITY—If,

Group of Insurance Cos., *874 P.2d 806 (Okla. 1994) and declined to approve the opinion for*

*publication.*

during any of the 1–year periods specified in Subparagraph 4.1(a) hereof, commencing with the 1st day of the month in which initial delivery is made from each well, Buyer shall fail to take the Contract Quantity of gas from such well, then Buyer shall pay Seller on or before the 20th day of the 2nd month of the next following year for that quantity of gas which is equal to the difference between the Contract Quantity and Buyer's actual takes during such period.... During the next 5 years succeeding a year in which Buyer has failed to take the gas so paid for, all gas well gas taken by Buyer from Seller which is in excess of the Contract Quantity of gas for the current year shall be known as Make-up Gas and shall be delivered without charge to Buyer until such excess equals the amount of gas previously paid for but not taken....

The Colorado Court of Appeals addressed this very issue in the context of a summary judgment granted against CIG dismissing its claims against Chemco, Inc. for entitlement to "make-up gas." CIG claimed that after satisfying a judgment rendered against it in favor of Chemco, Inc. for failing to make take or pay payments in accordance with the terms of a GPA, it was entitled to recoupment and refund of make-up gas. The court found that CIG's payment of the judgment for take or pay damages did not constitute performance under the contract that would entitle it to return performance by Chemco. Initially, the court noted that one of the purposes of a take or pay contract is to meet the needs of producers for steady income so they can pay operating costs, taxes, and royalties. Then, the court stated:

> Even if we assume that payment of the judgment with interest after years of litigation was sufficient to compensate Chemco for the loss of this part of its

bargain, that does not mean that such payment triggered Chemco's return performance obligations under Section 4.2. Chemco's obligation to provide make-up gas was limited to five years after the contract year in which CIG failed to take gas. Here, the jury awarded damages for CIG's failure to perform its "pay" obligation for years 1980—1988, but those damages were not paid until 1993. Moreover, even during the five year recoupment period, CIG's entitlement to make-up gas was measured by "the amount of gas previously paid for but not taken." The damages awarded in Chemco I were not payment for gas, but were payment for CIG's "failure to purchase (take) gas."

*Colorado Interstate Gas Company v. Chemco, Inc.*, 987 P.2d 829, 832 (Colo.Ct. App.1998).

In *R.B.J. Gas Pipeline*, which also involved an award of make-up volumes to CIG under a take or pay contract in which CIG was found to be in breach for failure to take or pay for volumes of gas, the court stated:

> In a gas purchase contract, take-or-pay provisions and recoupment provisions are special and are designed to meet the needs of two sophisticated business entities who are deemed to have allocated the risks involved in these types of contracts.... Because CIG made no deficiency payments at all, it has no right of recoupment after it has been assessed damages for breach of contract. By paying the judgment, CIG is not paying for the gas, it is paying damages for breach of contract.

813 P.2d at 25. While neither of these cases are binding on this court, we agree with the reasoning in these decisions.

■ We further note that in a take or pay contract, the buyer takes a risk that it

might not be able to make up a deficiency within the make-up period such as the situation where the well ceases to be capable of production. *Lone Star Gas Company v. Glenn H. McCarthy*, 605 S.W.2d 653, 656 (Tex.Civ.App.—Houston [1st Dist.] 1980, writ ref'd n.r.e.). CIG had the right to either take gas or pay for it. CIG voluntarily elected to do neither until ordered to do so by way of judgment. The trial court's judgment was not entered until more than five years after the last year for which the jury found a contract quantity deficiency. By electing not to comply with the contract provisions, CIG assumed the risk that it would not be able to make up those deficiencies and should not be relieved from the adverse effects of its own actions. We sustain the Hunts' first issue, which action requires us to render judgment that CIG take nothing with respect to equitable make-up rights.

In their second issue, the Hunts allege that the trial court erred in denying the Hunts attorney's fees as found by the jury. CIG moved to strike the testimony of Richard Hunt as an expert witness on attorney's fees pursuant to Rule 215 of the Texas Rules of Civil Procedure on the basis that Hunt was never identified as an expert witness in response to interrogatory requests. The Hunts responded that there was an exchange of information in which a summary of all attorney's fees was submitted on December 9, 1994, and that Hunt was designated in a witness list served on December 16, 1994, prior to trial commencing January 9, 1995.

The interrogatory and answer upon which CIG relies in arguing that Hunt's testimony should be excluded is found in Defendant's Second Set of Interrogatories and reads as follows:

6. Identify each expert who may be called by you as a witness in this case and state separately, as to each such person, the subject matter on which the witness is expected to testify, the mental impressions and opinions held by the expert, and the facts known to the expert (regardless of when the factual information was acquired) which relate to or form the bases of the mental impressions and opinions held by that expert. *ANSWER:* Plaintiffs have not determined which experts, if any, will be called as a witness in this case. At the present time it is anticipated that Don Rhodes will testify. He will testify to the calculations of the amounts due Plaintiffs from CIG. The mental impressions, opinions and facts known to him are as shown in the summary of the calculations he has performed, a copy of which previously has been furnished to CIG. Also see Plaintiffs' Supplemental Response to Defendant's First Set of Interrogatories and Request for Production of Documents.

Although this interrogatory was supplemented as to other expert witnesses, it was never supplemented with the name of one of the Hunts' counsel, Richard Hunt.

In a fourth set of interrogatories served by CIG, inquiry was made as to the identification of all experts retained by plaintiffs in connection with their claim for attorney's fees, as well as additional information. The plaintiffs objected to this interrogatory "to the extent it requests reports from experts whose identity and conclusions are not subject to discovery under Rule 166b because they will neither testify nor provide information to a testifying expert." We do not believe that this objection relieved the plaintiffs from their duty to supplement the second set of interrogatories as to expert witnesses, nor lodged a proper objection to the request for *identification* of expert witnesses as to attorney's fees in the fourth set of interrogatories.

 Pursuant to Texas Rule of Civil Procedure 215(5) in effect at the time of this trial, when a party fails to supplement a discovery request, the sanction is the automatic exclusion of the unidentified witness's testimony. *Sharp v. Broadway National Bank,* 784 S.W.2d 669, 671 (Tex. 1990). The exception to this rule is when the party can show good cause for its failure. Tex.R. Civ. P. 215(5). Lack of surprise, inadvertence of counsel, and the uniqueness of the evidence are not in themselves good cause. *Alvarado v. Farah Manufacturing Company,* 830 S.W.2d 911, 915 (Tex.1992). However, these factors, taken together or in some combination, may constitute good cause. *Henry S. Miller Co. v. Bynum,* 836 S.W.2d 160, 162 (Tex.1992). Discovery sanctions imposed by a trial court are within the discretion of that court, and their imposition will be set aside only if the trial court clearly exceeded that discretion. *Bodnow Corp. v. City of Hondo,* 721 S.W.2d 839, 840 (Tex.1986).

The Hunts rely on the prior opinion of this court in *Johnson v. Berg,* 848 S.W.2d 345 (Tex.App.—Amarilllo 1993, no pet.), as authority for their argument that there was lack of surprise and inadvertence of counsel such as to justify good cause. Our decision in *Johnson* was based on the fact that there was some effort to supplement discovery by way of a letter which implied the witness would be called at trial, and a six-month length of time between the deposition of the medical expert and trial. *Id.* at 351. Further, this expert was the only expert on the appropriate standard of care, and when his testimony was excluded, a directed verdict in favor of the defendant resulted. Our concern was that sanctions, that by their severity prevent a trial on the merits, cannot be justified absent a party's flagrant bad faith or counsel's callous disregard. *Id.* at 352; *See also Chrysler Corp. v. Blackmon,* 841 S.W.2d 844, 849 (Tex.1992).

In this case, the Hunts did not attempt to "supplement" their discovery until Hunt was designated as a witness on the trial witness list less than 30 days prior to trial. Furthermore, this testimony did not affect the trial on the merits. We therefore believe that the case at bar is distinguishable from *Johnson,* and the trial court did not abuse its discretion with the imposition of this sanction. The Hunts' second issue is overruled.

 In their third issue, the Hunts claim that the trial court erred in its denial of their Motion for Judgment Notwithstanding the Verdict as to the ownership interests in the G.C. Davis 1–61 well. The argument is that the jury's conclusion is unsupported by the evidence because the interests owned by the Hunt Companies could not, as a matter of law, be less than those testified to by Steven Payte.

In Question No. 2, the jury was asked the current ownership interest, if any, of each of the entities named as to each Davis Well. Out of 12 entities, the jury found a percentage of ownership for Hunt Petroleum Corporation, Hassie Hunt Production Company, Petro–Hunt Corporation and the Lamar Hunt Trust Estate. The jury found no ownership interest for the other eight entities named.

 As noted previously, the issue of ownership was relevant to the proof of damages, and to that extent was an issue on which the Hunts had the burden of proof. In attempting to overcome what is essentially an adverse finding against them on this issue, the Hunts must demonstrate that the record contains no evidence supporting the finding and that the entire record establishes the contrary proposition as a matter of law. *Croucher v. Croucher,* 660 S.W.2d 55, 58 (Tex.1983); *Holley v. Watts,* 629 S.W.2d 694, 696 (Tex.1982). A jury is not bound by the opinion evidence

of experts and can form its own opinion from other evidence and by use of its own experience and common knowledge. However, a jury must have some basis for its conclusion. *Coffee v. City of Alvin*, 641 S.W.2d 597, 601 (Tex.App.—Houston [14th Dist.] 1982, writ ref'd n.r.e.).

The Hunts contend that because the jury heard only two witnesses testify concerning the ownership in the G.C. Davis 1–61 well, and because those experts' findings were admitted into evidence as Plaintiff's Exhibits 145 and 171, there was no evidence from which the jury could have found any ownership interests less than the interests presented in that testimony and in those exhibits. However, we decline to find that there was no evidence before the jury to support its verdict.

Defendant's Exhibit No. 91 contains a Gas Division Order dated February 26, 1992, provided by CIG to Petro–Hunt Corporation for signature with respect to the G.C. Davis 1–61 Well. Sharon Gramer, the supervisor of division orders for CIG, testified that her department was responsible for seeing that the people who were paid for the gas actually owned it and had a right to payment. She stated that she was willing to send division orders out in February 1992 because she "felt it was expedient to get out the division orders. And if I was missing interim documents, that I was willing to go along with the showing [sic] division orders and they could furnish me the interim documents later." She based the interests shown on this division order on schedules furnished in a deposition and backup assignments. While this division order is unsigned, the interests set forth for Hunt Petroleum Corporation, Hassie Hunt Production Company, Petro–Hunt Corporation and the Lamar Hunt Trust Estate are the exact ownership interests found by the jury for those parties with respect to the G.C. Davis 1–61 well. This was some probative evidence which the jury had before it to support the conclusion reached by it as to the ownership interest of those four plaintiffs.

The jury also found that Hassie Hunt Exploration Company, Johnson Southwest, Inc., the Lyda Hunt–Bunker Trust, the Nelson Bunker Hunt Trust Estate, the William Herbert Hunt Trust Estate, Prosper Energy Corporation, Rosewood Resources, Inc. and Propel Energy Company had no ownership interest in the G.C. Davis 1–61 well. Those findings of the jury with respect to Johnson Southwest, Inc., the Nelson Bunker Hunt Trust Estate, Prosper Energy Corporation, Rosewood Resources, Inc., and Propel Energy Company are not inconsistent with the testimony of the Hunts' expert witness, and we do not construe the Hunts' issue as complaining of such.

Although the Hunts do not specifically so state, their issue could be construed as complaining of the jury verdict with respect to the finding of no ownership interest in Hassie Hunt Exploration Company, the Lyda Hunt–Bunker Trust, and the William Herbert Hunt Trust Estate. The Hunts' expert witness, Payte, testified that the G.C. Davis 1–61 well had incomplete documentation and still did as of the date of trial. He also testified that he did not check the courthouse to see if there were any adverse claims existing against any of the Hunt trusts. Payte further testified that there was a problem with the documentation regarding the dissolution of Propel Energy Company through which the Lyda Hunt–Bunker Trust took an interest in that section of land. Additionally, there was testimony that the William Herbert Hunt Trust Estate was in bankruptcy, and Sharon Gramer testified that property could be lost in bankruptcy. There was also expert testimony that ownership in this well was "a mess."

Both Payte and CIG's expert witness, Roy Gurley, testified as to the ownership interests in this well, and although each expert found some interest, they disagreed as to the amount of interest owned by each of those three entities. None of the ownership interests found by either expert agreed with the ownership interests for those three entities as shown on the 1992 division order (Defendant's Exhibit No. 91) prepared by CIG, nor do they agree with the ownership interests shown on Defendant's Exhibit No. 92, which is an agreement between the plaintiffs dated June 10, 1994, which warrants the interests of the various parties in each well. The interests on both of those documents, though not the same as each other, are less than the interests testified to by the experts. Thus, these three plaintiffs have failed to establish as a matter of law that their ownership interest in the G.C. Davis 1–61 well could not be less (even to the point of no ownership finding at all) than that testified to by Payte or Gurley. The Hunts' sixth issue is overruled.

In the Hunts' last issue, it is contended that the trial court erred in failing to grant judgment nunc pro tunc to the date of its original judgment. The original judgment was signed on December 24, 1996. That judgment was vacated on March 6, 1997, and the final judgment was signed on December 10, 1997. The Hunts claim that they have been deprived of the difference between the prejudgment interest of 6% and the post-judgment interest of 10% during this delay. Since, according to the Hunts, the delay was not caused by any fault of the Hunts, equity requires that judgment nunc pro tunc be entered as of a date no later than December 24, 1996.

A judgment nunc pro tunc is one that corrects clerical errors executed after the trial court has lost its plenary power. *Owens–Corning Fiberglas Corp. v.*

*Wasiak,* 883 S.W.2d 402, 404–05 (Tex. App.—Austin 1994, no writ); and *Ferguson v. Naylor,* 860 S.W.2d 123, 126 (Tex. App.—Amarillo 1993, writ denied). When a judgment has been rendered and later vacated, the matter is as if there had been no judgment. *Sawyer v. Donley County Hospital District,* 513 S.W.2d 106, 109 (Tex.Civ.App.—Amarillo 1974, no writ).

The Hunts do not directly argue that only clerical errors were corrected by the court's final judgment, nor that the original judgment was vacated outside of the trial court's plenary power. As we understand the Hunts' argument, they believe that since the trial court took almost a year after entry of the original judgment to both vacate and enter the final judgment, they have been economically deprived of the difference between pre- and post-judgment interest as of the date of the original judgment. They contend that since the delay in the rendition of the final judgment was due to no fault of their own, the final judgment should be dated as of the date of the original judgment.

In support of this proposition, they cite *Wright v. Longhorn Drilling Corporation,* 202 S.W.2d 285 (Tex.Civ.App.—Austin 1947, writ ref'd). In that case, the defendants filed a motion for judgment on the verdict; however, no judgment was pronounced or rendered prior to the expiration of the term of the court on April 16, 1946. Defendants then filed a motion for judgment nunc pro tunc on June 15, 1946, and the judgment was entered December 3, 1946. The court stated that a judgment may be both rendered and entered by a court nunc pro tunc where the delay was caused solely by the court itself. *Id.* at 287. In that case, there was no discussion of any post-trial motions filed by the parties or any evidence of any general disagreement over the form or substance of that judgment.

In contrast, the case at bar contains post-trial motions filed by both parties requesting substantive changes in the judgment, and the record indicates that the trial court intended to enter a judgment nunc pro tunc prior to the date that its plenary power would be lost if it believed that only clerical errors needed to be corrected. However, if the trial court needed more time to consider the merits of the substantive arguments made by the parties at the post-judgment hearing, it would vacate the prior judgment so as to have time to consider the merits of the contested issues. The trial court subsequently vacated the prior judgment.

This is not a situation where the court inadvertently failed to render a judgment at all through no fault of the Hunts. This is a situation where both parties asked the trial court to consider substantive issues in motions filed both before and after the original judgment was rendered. We do not believe that the Hunts are entitled to a judgment nunc pro tunc for the purpose of awarding post-judgment interest because the trial court needed time to consider relief requested by the parties. The Hunts' fourth issue is overruled.

In summary, we overrule CIG's three issues, and the Hunts' second, third, and fourth issues. Having sustained the Hunts' first issue with respect to the award of equitable make-up rights to CIG, we modify the judgment of the trial court to delete that recovery by CIG. *See* Tex. R.App. P. 43.2(b). As modified, the judgment is affirmed.

### ON MOTION FOR REHEARING

Appellant Colorado Interstate Gas Company (CIG) has filed a motion for rehearing asserting errors in our original disposition of this appeal. Among those asserted errors is the use of an incorrect date in our discussion of one of CIG's issues. On page nine of our original opinion, it is stated:

CIG claimed that because each of the wells qualified as § 107 and § 102 gas, and because § 107 gas was deregulated prior to the execution of the GPA, then in accordance with 5.1(b), the last regulated price of § 107 gas governed the contractual price. It asserted, therefore, that the parties should look to the October 31, 1984 regulated price of § 107 deep gas as the "price hereunder in effect immediately prior" to deregulation, and utilize that price for determining payment obligations.

CIG asserts that the date of October 31, 1984, is a typographical error in this portion of our opinion and should have been October 31, 1979. The record supports this contention and to that extent, the motion for rehearing is granted. However, this error has no effect on our original disposition of this appeal.

After review of appellant's other asserted errors, we remain convinced our original disposition was correct. With the exception of the date modification, appellant's motion for rehearing is overruled.