

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-12-00362-CV

RONALD B. "BUD" FORMAN, ARBORS
DEVELOPMENT, LLC, AND THE
ROSEBUD DEVELOPMENT, LTD.

APPELLANTS

V.

CLASSIC CENTURY HOMES, LTD.

APPELLEE

-----------

FROM THE 67TH DISTRICT COURT OF TARRANT COUNTY
TRIAL COURT NO. 67-233602-08

----------

## MEMORANDUM OPINION[1]

----------

## I. Introduction

In three issues, Appellants Ronald B. "Bud" Forman; Arbors Development,
LLC; and The Rosebud Development, Ltd. (collectively, the Developers) appeal

---

[1] *See* Tex. R. App. P. 47.4.

the trial court's Modified Final Judgment.  We will affirm in part and reverse and remand in part.

## II. Procedural Background and Statement of Facts

The Developers entered into two contracts, Phase I and Phase II, with Appellee Classic Century Homes, Inc. (Classic) regarding residential lots located within the Rosebud Development.  The Phase I contract was signed August 16, 2002, and required Classic to purchase sixty-four single-family lots according to a set schedule, referred to as a "Takedown Schedule."  The Phase II contract was signed August 31, 2005, and required Classic to purchase forty-three additional lots as set forth in a second Takedown Schedule.  The Phase II contract also required Classic to pay interest as set forth in the contract and all ad valorem taxes, prorated from the date of the initial "Closing" to each respective purchase date.[2]  Instead of purchasing forty-three lots by the required date of May 27, 2007, under the Phase II Takedown Schedule, Classic purchased only twenty lots and did not pay the interest or ad valorem taxes on the remaining unpurchased twenty-three lots.

In addition, at closing, the Phase II contract required Classic to "reimburse" the Developers $1,915.00 per lot for prepaid water taps or a "capital improvement fee."  Therefore, for each of the Phase II lots purchased by Classic,

---

[2]The contract stipulated that "the purchase and sale of the Lots shall be closed in separate transactions . . . ."

2

it paid the capital improvement fee to the Developers.[3]  However, in mid-2008 Classic learned that the Developers had not paid all the Phase II capital improvement fees.  In response, the Developers explained that (1) it was the general course of business of the Developers to pay the fees when Classic was ready to begin construction, (2) it was against the water district's policy to allow a developer to reserve a water meter for each specific lot, and (3) the district limited the number of meters that could be reserved at one time based on availability.  The record does not contain an explanation of why then there was a "prepaid" provision in the contract.

In connection with borrowing money from the bank to purchase each lot under Phase I and Phase II, which included the capital improvement fee, a HUD-1 Settlement Statement was furnished to the bank.  In each Settlement Statement, the Developers asserted that the capital improvement fee had been paid.  However, in what the Developers asserted was their general course of business, it did not pay a fee for each lot but instead paid for a group of lots and then applied the fee to individual lots as builders began construction.  According to Classic, the Developers did not disclose this methodology.  Consequently, twenty-five of the lots' capital improvement fees had not been paid and as a result, those fees would have to be paid "again" in order for Classic to begin building.

_____

[3]Classic paid a total of $19,150 for the prepaid water meters under the Phase II contract.

3

As a result of its paying capital improvement fees that had in fact not been paid, Classic sued the Developers on October 28, 2008,[4] asserting breach of contract and fraud, among other causes of action. The Developers counterclaimed for Classic's failure to purchase all of the lots agreed to pursuant to the Takedown Schedules. After a trial to the bench, with findings of fact and conclusions of law made, the trial court awarded compensatory and exemplary damages to Classic and a take nothing judgment as to the Developers' counterclaim. This appeal resulted.

### III. Trial to the Bench and Evidentiary Sufficiency Challenges

A trial court's findings of fact have the same force and dignity as a jury's answers to jury questions and are reviewable for legal and factual sufficiency of the evidence to support them by the same standards. *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994); *Anderson v. City of Seven Points*, 806 S.W.2d 791, 794 (Tex. 1991); *see also MBM Fin. Corp. v. Woodlands Operating Co.*, 292 S.W.3d 660, 663 n.3 (Tex. 2009).

We may sustain a legal sufficiency challenge only when (1) the record discloses a complete absence of evidence of a vital fact, (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence establishes conclusively the opposite of a vital

---

[4]The Second Amended Petition was the live pleading at trial.

fact. *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex. 1998), *cert. denied*, 526 U.S. 1040 (1999); Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 Tex. L. Rev. 361, 362–63 (1960). In determining whether there is legally sufficient evidence to support the finding under review, we must consider evidence favorable to the finding if a reasonable fact-finder could and disregard evidence contrary to the finding unless a reasonable fact-finder could not. *Cent. Ready Mix Concrete Co. v. Islas*, 228 S.W.3d 649, 651 (Tex. 2007); *City of Keller v. Wilson*, 168 S.W.3d 802, 807, 827 (Tex. 2005).

Any ultimate fact may be proved by circumstantial evidence. *Russell v. Russell*, 865 S.W.2d 929, 933 (Tex. 1993). A fact is established by circumstantial evidence when the fact may be fairly and reasonably inferred from other facts proved in the case. *Id.* However, to withstand a legal sufficiency challenge, circumstantial evidence still must consist of more than a scintilla. *Blount v. Bordens, Inc.*, 910 S.W.2d 931, 933 (Tex. 1995).

When reviewing an assertion that the evidence is factually insufficient to support a finding, we set aside the finding only if, after considering and weighing all of the evidence in the record pertinent to that finding, we determine that the credible evidence supporting the finding is so weak, or so contrary to the overwhelming weight of all the evidence, that the answer should be set aside and a new trial ordered. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986)

5

(op. on reh'g); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965).

## IV. Laches

In its first issue, the Developers assert that Classic's claims are barred by the doctrine of laches and by the contractual provision that all representations by either party only survive the contract by one year.

To prevail on the affirmative defense of laches in this case, the Developers had to show that (1) Classic had a legal or equitable right and unreasonably delayed in asserting that right, and (2) the Developers suffered harm as a result of the delay. *Frequent Flyer Depot, Inc. v. Am. Airlines, Inc.*, 281 S.W.3d 215, 229 (Tex. App.—Fort Worth 2009, pet. denied) (citing *Rogers v. Ricane Enterprises, Inc.*, 772 S.W.2d 76, 80 (Tex. 1989)); *see also City of Fort Worth v. Johnson*, 388 S.W.2d 400, 403 (Tex. 1964).

As to the first prong, the Developers assert that there was an "unreasonable delay" between Classic entering into the Phase I contract in 2002 and the filing of the suit in 2008. However, the evidence shows that Classic did not discover the nonpayment of the water tap fees until mid-2008, not 2002, and filed suit shortly thereafter. *Condom Sense, Inc. v. Alshalabi*, 390 S.W.3d 734, 758 (Tex. App.—Dallas 2012, no pet.) (holding in a trademark infringement case that the period of laches began when the owner of the mark had knowledge of the allegedly infringing use). Because there was no unreasonable delay by Classic in asserting its rights, this argument is without merit.

6

The Developers next seem to argue that the complaints regarding the Phase I contract were not raised until the Second Amended Original Petition and that the "delay" was the time between the filing of the Original Petition and this second pleading. However, both the Original Petition and Classic's demand letter identified the lots in which the fees had not been paid; rather, the error was in failing to recognize that some of those lots were under the Phase I Contract. This distinction, however, is immaterial; because once the lots are specified, then they are easily identified and there would be no difficulty in ascertaining whether the capital improvement fees had been paid.

The Developers also assert that is was

> unable to adequately prepare a defense or ascertain the true facts being used against them . . . [in that they] prepared for and presented this case under the justified presumption that [Classic] had erroneously included properties governed by the Phase I Contract in its pleaded claims on the Phase II Contract.

This assertion is again without merit because Classic specifically identified the lots in the original petition, just not whether they were designated in Phase I or Phase II.

The Developers lastly argue that had Classic initially complained about the Developers' methodology regarding the capital improvement fees, it "would no doubt stand before this Court in a much different position today for they would not have been subjected to a breach of contract or fraud claim." Again, the record demonstrates that Classic was unaware of the Developers' methodology until after it entered into the Phase II contract. As such, Classic could not have

7

questioned the methodology before then and, in fact, filed suit shortly after the discovery. The evidence is legally and factually insufficient to support a finding of laches under these facts. This portion of the Developers' first issue is overruled.

The Developers next assert that the language in the contract limited the survival of any and all complaints about the contract, including the prepaid fee methodology, to a period of one year after Closing,[5] and therefore, Classic's claims are time barred. This assertion however was not pleaded nor brought forth at trial and hence is not preserved for our review. Tex. R. App. P. 33.1. The final portion of Developers' first issue is overruled.

## V. Exemplary Damages

In the Developers' second issue, they assert that there was not clear and convincing evidence of fraudulent inducement to warrant the award of exemplary damages to Classic.

### A. Clear and Convincing Evidence and Sufficiency of that Evidence

Clear and convincing evidence is that measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established. Tex. Civ. Prac. & Rem. Code Ann. § 41.001(2) (West 2008); Tex. Fam. Code Ann. § 101.007 (West 2014); *U-Haul Int'l, Inc. v. Waldrip*, 380 S.W.3d 118, 137 (Tex. 2012); *State v. K.E.W.*, 315

---

[5]Each contract contained a limitation clause providing that "[a]ll representations, warranties[,] and covenants and agreements made by Seller and Purchaser herein shall survive the Closings for a period of one year only."

8

S.W.3d 16, 20 (Tex. 2010). This intermediate standard of proof falls between the preponderance standard of proof of most civil proceedings and the reasonable doubt standard of proof of most criminal proceedings. *In re G.M.*, 596 S.W.2d 846, 847 (Tex. 1980); *State v. Addington*, 588 S.W.2d 569, 570 (Tex. 1979). While the proof must be of a heavier weight than merely the greater weight of the credible evidence, there is no requirement that the evidence be unequivocal or undisputed. *Addington*, 588 S.W.2d at 570.

We review all the evidence in the light most favorable to the finding. *Waldrip*, 380 S.W.3d at 138; *Columbia Med. Ctr. Of Las Colinas, Inc. v. Hogue*, 271 S.W.3d 238, 248 (Tex. 2008). We resolve any disputed facts in favor of the finding if a reasonable fact-finder could have done so, and we disregard evidence contrary to the finding unless a reasonable fact-finder could not. *K.E.W.*, 315 S.W.3d at 20; *Hogue*, 271 S.W.3d at 248. That is, we consider undisputed evidence even if it is contrary to the finding. *Hogue*, 271 S.W.3d at 248; *Keller*, 168 S.W.3d at 817.

The fact-finder, not this court, is the sole judge of the credibility and demeanor of the witnesses. *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009). We must not supplant the trial court's judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2008); *see also Barker v. Eckman*, 213 S.W.3d 306, 314 (Tex. 2006).

Evidence that merely exceeds a scintilla is not legally sufficient. *K.E.W.*, 315 S.W.3d at 20. In evaluating the evidence for factual sufficiency, we

9

determine whether, on the entire record, a fact-finder could reasonably form a firm conviction or belief that its finding was true. *In re H.R.M.*, 209 S.W.3d at 108. If we determine that no reasonable fact-finder could form a firm belief or conviction that its finding was true, then we must conclude that the evidence is legally insufficient. *Diamond Shamrock Ref. Co. v. Hall*, 168 S.W.3d 164, 170 (Tex. 2005) (op. on reh'g); *Sw. Bell Tel. Co. v. Garza*, 164 S.W.3d 607, 627 (Tex. 2004).

## B. Fraudulent Inducement

Texas law has long imposed a duty to abstain from inducing another to enter into a contract using fraudulent misrepresentations. *Formosa Plastics v. Presidio Eng'rs*, 960 S.W.2d 41, 46 (Tex. 1998). It is well established that the legal duty not to fraudulently procure a contract is separate and independent from the duties established by the contract itself. *Id.* Prior decisions also clearly establish that tort damages are not precluded simply because a fraudulent representation causes only an economic loss. *Id.* at 47. Accordingly, tort damages are recoverable for a fraudulent inducement claim irrespective of whether the fraudulent representations are later subsumed in a contract, or whether the plaintiff only suffers an economic loss related to the subject matter of the contract. *Id.*

To prevail on a claim for fraudulent inducement and avoid application of the economic loss rule, a claimant must prove by clear and convincing evidence that (1) the defendant made a material representation; (2) the representation was

false; (3) at the time the representation was made, the defendant either knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the defendant made the representation with the intent that the claimant would act upon it; (5) the claimant relied on the representation; and (6) the claimant suffered damages as a result. *See Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 338 (Tex. 2011); *Aquaplex Inc. v. Rancho La Valencia, Inc.*, 297 S.W.3d 768, 774 (Tex. 2009) (per curiam). The fraudulent inducement elements are similar to the elements of statutory fraud involving real estate, which are:

(a) Fraud in a transaction involving real estate or stock in a corporation or joint stock company consists of a

(1) false representation of a past or existing material fact, when the false representation is

(A) made to a person for the purpose of inducing that person to enter into a contract; and

(B) relied on by that person in entering into that contract.

Tex. Bus & Com. Code Ann. § 27.01(a) (West 2009).

The record does not contain any evidence that the Developers would prepay the capital improvement fees for the lots purchased under the Phase 1 contract, and in fact, the disclaimer previously set forth is of the opposite intent under the contract.[6] The only evidence regarding the prepayment of fees is a

---

[6]The Phase I contract contained an expressed disclaimer of any representations with respect to the availability or any existence of water, sewer, or utilities.

statement in the HUD-1 Settlement Statement that those fees had been paid. This representation, however, was made to the lending bank after the execution of the Phase I contract and was not made to Classic. *See Valsangiacomo v. Am. Juice Imp., Inc.*, 35 S.W.3d 201, 209 (Tex. App.—Corpus Christi 2000, no pet.) Further, no evidence was presented that this representation was made with the intent that Classic would rely on it, and as a result, we hold that the evidence is legally and factually insufficient to support a finding of fraudulent inducement as to the Phase I contract.  As such, the first portion of the Developers' second issue is sustained.

However, the same is not true of the lots purchased under the Phase II contract, which required Classic to pay the Developers at closing for "prepaid water taps."  Turning to the elements of fraudulent inducement previously set forth, we hold that (1) the Developers made a material representation when they asserted that the expense charged to Classic was to cover the fees for water taps already paid by the Developers, which for all forty-three lots would be potentially in excess of $82,000.00—an amount which certainly constitutes a significant amount of money and a material term, (2) this representation was false because the water taps were not previously paid, (3) since it was the Developers who were supposed to have paid the fees, they were in a position to know that these fees had not been paid at the time they made the assertion, (4) the Developers received the money from Classic for the supposed prepaid capital improvement fees, demonstrating their intent that Classic rely on the

12

representation, which it did by paying the fees, and (5) these actions by the Developers caused damages to Classic when Classic later had to pay the fees a second time because they had not been previously paid. We hold that the evidence meets the clear and convincing standard as to all elements of the fraudulent inducement claim and as to statutory fraud in real estate transactions.

We therefore sustain the Developers' second issue with respect to the lots referenced in the Phase I contract and overrule the Developers' second issue with respect to the lots referenced in the Phase II contract.

## VI. Counterclaim

In their final issue, the Developers assert error on the part of the trial court by denying their claim for breach of contract against Classic because they conclusively established that breach with respect to the Phase II contract.

There is no question that Classic breached the Phase II contract as it was originally entered into. Classic agreed to purchase forty-three residential lots according to five transactions set forth in the Takedown Schedule, and Classic did not meet the schedule. Classic purchased only twenty lots. The question, however, is whether the contract was enforceable when breached. Paragraph 5 of the Phase II contract states that "[a]s a condition to keeping this contract in effect, [Classic] shall deposit earnest money ("Earnest Money") in the amount of . . . ($43,000.00) with [the Developers] within five (5) days of the start of construction." Classic never deposited any money. The contract also has language concerning "Substantial Completion" of the lots, which in part states

13

"that water and sewer taps are available to each of the Lots subject to the payment of all tap-in fees . . . the payment of which is the obligation of the Purchaser."  Forman acknowledged at trial that having water to the lots was a condition of substantial completion because no builder wanted to buy lots that he could not then begin building upon.  Jimmy Morrow, owner of Classic, also testified that the subdivision would not have been substantially complete and the lots would be worthless to the builder without water.  Closing was predicated on substantial completion of the lots, which did not occur.

Therefore, the Developers failed to prove that they had performed their obligations under the contract with respect to substantial completion, and Classic had not performed its obligation with respect to payment of the earnest money. In order to recover for breach of contract, the Developers were required to prove that they had actually performed.  *See McLaughlin, Inc. v. Northstar Drilling Techs., Inc.*, 138 S.W.3d 24, 27 (Tex. App.—San Antonio 2004, no pet.).  A breach of reciprocal promises in a contract by one party excuses performance by the other party.  *Shaw v. Kennedy, Ltd.*, 879 S.W.2d 240, 247 (Tex. App.—Amarillo 1994).  A party that has breached the contract itself cannot then insist on performance by the other party.  *Mustang Pipeline Co., Inc. v. Driver Pipeline Co., Inc.*, 134 S.W.3d 195, 196 (Tex. 2004); *E. Friedman & Assocs., Inc.*, 412 S.W.3d 561, 565 (Tex. App.—Amarillo 2013, no pet.).  Nor can a party in breach recover damages for a subsequent breach of the agreement by the other party. *Green v. A.R. Clark Inv. Co.*, 363 S.W.2d 802, 815 (Tex. Civ. App.—Fort Worth

14

1962), *rev'd on other grounds*, 375 S.W.2d 425 (Tex. 1964); *Colorado Interstate Gas Co. v. Hunt Energy Corp.*, 47 S.W.3d 1, 9–10 (Tex. App.—Amarillo 2000, pet. denied). Furthermore, a party in breach may not set up a subsequent breach by the other party to provide relief from its own breach. *Mead v. Johnson Group, Inc.*, 615 S.W.2d 685, 689 (Tex. 1981). Therefore, the Developers had already breached the contract by not substantially completing the lots when Classic breached by failing to pay the earnest money.

Further, as a general rule, a contract procured by fraud is not void but voidable by the defrauded party. *Formosa Plastics Corp.*, 960 S.W.2d at 46. A contract that is voidable because it was the product of fraud remains enforceable and is voided only if the defrauded party proves a right to avoid the contract and chooses to do so. *Harris v. Archer*, 134 S.W.3d 411, 428 (Tex. App.—Amarillo 2004, pet. denied); *see Swain v. Wiley College*, 74 S.W.3d 143, 146 (Tex. App.—Texarkana 2002, no pet.). In this sense, fraudulent inducement is properly characterized as a valid defense to enforcement of a contract. *Williams v. Glash*, 789 S.W.2d 261, 264 (Tex. 1990); *see McLernon v. Dynegy, Inc.*, 347 S.W.3d 315, 328 (Tex. App.—Houston [14th Dist.] 2011, no pet.).

Thus, once a defrauded party discovers the fraud, he is entitled to the choice of his remedies: "He may stand to the bargain and recover damages for the fraud, or he may rescind the contract, and return the thing bought, and receive back what he paid." *Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671, 676–77 (Tex. 2000) (citing *Dallas Farm Mach. Co. v. Reaves*, 307 S.W.2d 233,

15

238–39 (Tex. 1957)).  If a party induced by fraud to enter into a voidable agreement engages in conduct that recognizes the agreement as subsisting and binding *after the party has become aware of the fraud*, the party thereby ratifies the agreement and waives any right to assert the fraud as basis to avoid the agreement.  *Harris*, 134 S.W.3d at 427 (emphasis added) (citing *Rosenbaum v. Texas Bldg. & Mortg. Co.*, 167 S.W.2d 506, 508 (Tex. 1943)).  Here, Classic filed suit shortly after discovering the water tap fee misrepresentation and did not proceed under the contract; thus, Classic did not waive its rights to a legal damage remedy.

Therefore, we hold that the contract was unenforceable as to the Developers' counterclaim and overrule their third issue.

## VII.  Conclusion

Although the exemplary damages could have been awarded based solely on the fraudulent inducement as to the Phase II contract, they could also have been based on Classic's argument that it had to borrow an additional $50,000 to prepay the fees for lots under both the Phase I and Phase II contracts.[7]  Thus, although we have found that the fraud finding is supported by sufficient evidence as to Phase II, we must nevertheless remand the exemplary damages award for

---

[7]Classic argues in its brief that "Each of the settlement statements contains a false representation that the 'water meters' were prepaid.  Based on that misrepresentation, [the Developers] caused Classic to borrow money and 'reimburse' for those sums which had never been paid in the amount of approximately $50,000."

16

the trial court to determine whether that award should be reduced in light of our holding as to Phase I. *Alamo Nat. Bank v. Kraus*, 616 S.W.2d 908, 910 (Tex. 1981); Tex. Civ. Prac. & Rem. Code Ann. § 41.003 (West 2008 & Supp. 2014). We reverse the trial court's judgment in part and remand this case to the trial court for a recalculation of the exemplary damages only. We affirm the remainder of the trial court's judgment, including the take-nothing judgment as to Developers' counterclaim.

/s/ Bob McCoy

BOB MCCOY
JUSTICE

PANEL: MCCOY and GABRIEL, JJ.; and DIXON W. HOLMAN (Senior Justice, Retired, Sitting by Assignment).

DELIVERED: December 4, 2014