VAN WATERS & ROGERS,
INC., Appellant,

v.

QUALITY FREEZERS, INC. dba Quality
Fish Company, Appellee.

No. 09–93–056 CV.

Court of Appeals of Texas,
Beaumont.

Submitted Dec. 2, 1993.

Decided March 24, 1994.

Rehearing Overruled April 14, 1994.

Richard O. Faulk, Richard M. Parr, Akin, Gump, Strauss, Hauer & Feld LLP, Houston, for appellant.

Jon B. Burmeister, Moore, Landry, Garth & Jones, Beaumont, for appellee.

Before WALKER, C.J., and BROOKSHIRE and BURGESS, JJ.

## OPINION

BROOKSHIRE, Justice.

The plaintiff below, appellee here, instituted this litigation seeking damages as well as attorney's fees. The petition for relief was grounded on counts of negligence, breach of contract, and deceptive trade practices in connection with the sale and delivery of a chemical preservative purchased to apply to fresh shrimp. The fresh shrimp was to be sold in the market in Jefferson County. Among other allegations, Quality Freezers, Inc. (Quality) contended that the chemical preservative sold by Van Waters & Rogers, Inc. (Van Waters) was "an industrial strength" chemical which was not suitable for use upon food. As a result of this "industrial strength" preservative being the product received by Quality, Quality unknowingly applied the "industrial strength" chemical preservative to about 32,240 pounds of fresh shrimp. This preservative had been misrepresented to Quality by Van Waters. This large quantity of shrimp was subsequently condemned by the Texas Department of Health.

The trial was to a jury. Jury questions were deliberated upon by the factfinders and the jury found compensatory damages in the amount of $43,000 and a reasonable attorney's fee amounting to 15 percent of that stated amount. Quality had pleaded for actual damages for the loss of 32,240 pounds of shrimp, prejudgment and postjudgment interest, damages pursuant to the Texas Deceptive Trade Practices Act and in addition thereto, attorney's fees.

After the verdict was returned, Van Waters filed a motion and urged the trial court to render judgment on the jury's verdict. Quality filed a motion to disregard certain jury's answers and sought rendition of judgment in the full amount of Quality's claim.

The trial bench overruled Van Waters' motion and rendered judgment in the amount of $111,629.45. This figure represented $88,508.50 actual damages, $21,120.95 in prejudgment interest, and $2,000 pursuant to plaintiff's cause of action under the DTPA. Added thereto was an attorney's fee in the amount of $44,651.48. Van Waters' motion for new trial was overruled and this appeal ensued.

The evidence before the jury proved that the preservative sold by Van Waters was, in fact, an "industrial strength" preservative which was unsuited for use upon shrimp intended as food for human consumption. Quality applied the "industrial strength" chemical preservative to thousands of pounds of fresh shrimp which were subsequently condemned by the State of Texas Health Department. Quality processes and distributes shrimp and fish for food consumption by human beings. Quality had actually purchased sodium tripolyphosphate from Van Waters to use as a preservative following the peeling and de-veining of shrimp as it was processed for sale and ultimate human consumption. Quality showed, according to the record, that Van Waters represented that this sodium tripolyphosphate was of a proper quality for the use as a food grade preservative. Quality then demonstrated by ample, competent evidence that this chemical was not of the proper grade or the proper quality to be used in such a food process. The record demonstrates clearly that 32,240 pounds of shrimp were condemned—this is not controverted.

■ The appellant concedes in its brief that the evidence of actual damages, being measured as the fair market value of the condemned shrimp, was adduced through the testimony of Dixie Cappel, the owner and operator of Quality. Furthermore, the evidence introduced concerning the reasonable attorney's fees recovery was provided by the lawyers for Quality. Van Waters introduced

no evidence contradicting the testimony concerning fees. The evidence before the jury regarding the market value of the condemned shrimp was substantiated by documentary evidence produced from the Texas Department of Health. These documents were prepared by the professional staff of the State Health Department.

An exhibit setting out and clearly determining the market value of the shrimp at the time it was condemned came into evidence before the jury without objection. The State of Texas mandated the condemning of the shrimp. This exhibit was Plaintiff's Exhibit No. 5 which showed that the total pounds of shrimp that were condemned amounted to 36,240 pounds and that the exact value of the same was $88,508.50. Cogent and compelling (as well as important and set out in detail) is the fact that this exhibit lists the exact calculations per pound of the eleven different classifications of the shrimp with the appropriate price of each grouping. The exhibit bears a notation: "Non-food grade Sodium Tripolyphosphate added to shrimp, buried @ Pt. Arthur Municipal Landfill." This exhibit-document was signed by Eleanor Carnwright as the firm representative of Quality and Julie S. Lee as the authorized agent of the Texas Department of Health. This exhibit is No. 5 and is on an approved, official form of the Texas Department of Health, Division of Food and Drugs, Austin, Texas, 78756, and is entitled "Destruction Sheet for Condemned Foods & Drugs".

Plaintiff's Exhibit No. 6 also originated from the Texas Department of Health and is entitled "Field Correspondence" signed by Julie S. Lee, State Food and Drug Inspector. Ms. Lee determined that the shrimp had become adulterated and that sodium tripolyphosphate of an industrial grade had been used on the shrimp. This chemical preservative is available in a food grade; however, the "industrial grade" has been used on the condemned shrimp in question.

Plaintiff's Exhibit No. 1 was offered into evidence without objection. This exhibit described the material as "gran light density 50 pound bags of sodium tripolyphosphate". There was no distinction in writing or labeling on the bag as to whether it was food

grade or industrial grade sodium tripolyphosphate. The clear and cogent evidence concerning damages for the condemned shrimp, under the record, was $88,508.50. This amount is not controverted. The record reflects:

Q. And the lady with the Department of Health named Julie Lee came by in December and apparently did some checking on the type of chemical that was being used with the people in Austin, and basically you more or less agreed—well, you did agreed [sic] to hold those boxes of shrimp until they determined whether this stuff was good or bad, right?

A. That's correct.

Q. Whether it being industrial strength was acceptable or non-acceptable?

A. Right.

Q. And then in January of 1990, 36,000 and some odd pounds of shrimp were buried in the Port Arthur landfill, right?

A. That's correct.

Q. Okay. And as a result of losing 36,240 pounds of shrimp, Quality Fish Company lost $88,508.50, right?

A. That's right.

Q. Okay, Now, we have an exhibit, Exhibit No. 5, which details the number of boxes of shrimp that you had to throw away, right?

A. Yes, sir. Right.

Q. Okay, and by far, you had 635—was it 35 cases?

A. Right.

Q. And there's how many pounds in a case?

A. Fifty pounds.

Q. Okay, so 635 cases of shrimp at $2.35—(interrupted)

A. Right.

Q. So, basically we can go through that and it all adds up to $88,508.00?

A. That's correct.

. . . .

Q. Dixie, the price of $88,508.00, in your opinion, was that a—was that the fair market value of those shrimp on the day they were condemned?

A. Yes, that's correct.

Q. Okay. That's here in Jefferson County, Texas?

A. That's Jefferson County, Texas, and a couple of other states.

Q. Okay. And those were shrimp that Quality Fish had already purchased from the various shrimp boats, so you had already paid out money to those shrimpers to buy that shrimp; is that right?

A. That's right.

Q. Okay. So basically, Quality Freezers took an $88,000.00 hitkey [sic] in that particular episode, right?

A. Right.

Q. Okay. Or an $88,508.00 loss. And you basically had your attorneys contact Van Waters and asked to be reimbursed for this $88,508.00?

A. That's right.

Q. Plus the cost of the sodium tripolyphosphate that had been purchased?

A. That's right.

Q. And they refused, and the lawsuit resulted, correct?

A. Correct.

Q. And you've employed me and my firm to represent you and you are asking for reasonable attorneys fees?

A. That's correct.

The damages of $88,508.50 was not controverted at trial. Under this record, the $88,508.50 was established as a matter of law.

There is no evidence to support the jury's finding of $43,000 as a fair market value of the shrimp or as the compensable damages sustained by Quality. A similar fact situation arose in the well reasoned case of *Archer v. Schneider, Bernet & Hickman, Inc.,* 700 S.W.2d 699 (Tex.Civ.App.—Dallas 1985, writ ref'd n.r.e.). In the *Archer* case the undisputed evidence clearly established that the plaintiff's damages were in the amount of $6,548.49. However, the jury rendered a verdict regarding damages in a lower amount of $2,182.81. The Dallas Court of Appeals found the jury's answer to the damage issue was incorrect. The Dallas appellate court

affirmed the judgment of the trial court in favor of *Archer* for the sum of $6,548.47. The Dallas Court of Appeals stated that there was no need to speculate on what erroneous reasoning led the jury to conclude that the damages were $2,182.81 when the undisputed evidence established a higher value.

In the case sub judice, significant and compelling is the jury's finding that Van Waters engaged in false, misleading, or deceptive acts or practices that were a producing cause of damages to Quality. This finding is not challenged. The jury also found that Van Waters failed to comply with the agreement between the parties to provide the appropriate type of sodium tripolyphosphate. Under the jury's findings and under the evidence, violations of the Texas Deceptive Trade Practices Act were definitely proved.

The Deceptive Trade Practices Act provides that the prevailing party shall be awarded reasonable and necessary attorney's fees. TEX.BUS. & COM.CODE ANN. § 17.50(d) (Vernon 1987). Thus, inasmuch as the jury has found that the DTPA had been violated by Van Waters, then the attorney's fees are recoverable and the remaining question is simply the reasonableness and necessity of the attorney's fees. *See and compare Satellite Earth Stations East v. Davis,* 756 S.W.2d 385 (Tex.App.—Eastland 1988, writ denied).

When the testimony (concerning the reasonableness and the amount of attorney's fees) is not contravened and is not contradicted by other witnesses or not contradicted in the record, and the amount of attorney's fees is established by clear, direct, and positive evidence free from contradictions, inaccuracies, and circumstances; then the amount of attorney's fees is taken as true and established as a matter of law. *Ragsdale v. Progressive Voters League,* 801 S.W.2d 880 (Tex.1990). If the opposing lawyer has the means and opportunity of either disproving or discrediting the testimony or the evidence which establishes the attorney's fees; but nevertheless, fails to do so, then the uncontroverted, unimpeached testimony concerning attorney's fees is taken as true and this attorney's fees issue is established as a matter of law under Supreme Court

decisional precedents. *Id.* At the trial, Quality submitted evidence that 40 percent was the amount of reasonable and necessary attorney's fees in this case considering all the surrounding circumstances of this litigation.

We observe that cross-examination of Cappel had to do mainly with the issue of his comparative negligence, if any. The figures on the damages and the amount of the damages were not impeached. The record clearly reflects that the mark-up on peeled shrimp was about 5 percent. But, the record also reflects that Quality Fish had out-of-pocket cash purchases in the amount of $88,508 less 5 percent thereof. This 5 percent deduction, however, did not take into consideration expenses for overhead, equipment usage, labor, and other necessary, reasonable, and customary expenses.

The cross-examination of the next witness, Mrs. Carnwright, mainly had to do with her recollection as who made the first order and whether or not she used the words "food grade" when she placed the orders for the sodium. Her testimony was that she probably did use the words "food grade" when she made the orders that she placed with Van Waters. Apparently Cappel made the first order and Mrs. Carnwright made the later orders. We see nothing that impeaches the damage figure nor the "food grade" order. In fact, Mrs. Carnwright reinforced and reaffirmed it. The contingent fee, being a percentage attorney's fee, was well established by a qualified witness. The cross-examination merely asked if the attorneys were asking for a 40 percent of the amount to be awarded. Only five questions were asked on cross-examination. The attorney testifying was not impeached or discredited.

A balanced statement or summary of the record was that the defense of the suit was built on the concept of comparative negligence on the part of Quality and that Quality and its employees should have known that industrial or technical grade was not to be put on human food and that technical or industrial use was different from the type of chemical that was permitted to be used on food. The record reflects, however, that there was no such warning on the bags in question. These bags from Van Waters did

not warn or state that this chemical could not be used on human food. *Significant and compelling is the testimony given by an outside salesman for Van Waters on cross-examination:*

BY MR. BURMEISTER:

Q. Sir, let me ask you just a few other questions.

If I come to you and I ask for sodium tripolyphosphate and—to be put on shrimp—and you don't give me sodium tripolyphosphate that is suitable to be put on shrimp, you have not, if you understood what I was saying, and if ask for that and I articulated it and you had a chance to clarify anything that you didn't understand about it—my request. If you don't give me that, then you haven't lived up to your part of the agreement, have you?

A. I would agree with that.

Q. And if you don't give me what I ask for—sodium tripolyphosphate to put on shrimp—and you tell me you have what we need and you don't send it to me, then you have misrepresented what—what you have given me; is that also true?

A. That's true.

Q. And if I ask you for sodium tripolyphosphate to put on shrimp and I tell you that I'm with Quality Fish, and you either do not give it to me and do not inquire as to what I am going to be using it for, such that you don't understand, and you continue to send me the wrong kind, you have not lived up to your responsibilities, have you?

A. I'm not sure—(interrupted)

Q. Probably because it wasn't a very good question, I apologize.

What I'm getting at is, you also have some responsibilities to make sure the customer gets what they want.

A. Yes, sure, I make sure they get whatever they ask for.

Q. And if they ask for sodium tripolyphosphate to put on shrimp, and you don't give it to them, then you haven't lived up to your part of the deal; have you?

A. No, sir, not as long as they told me.

Q. And if you tell them that we're sending you sodium tripolyphosphate that you can put on shrimp or if they say anybody from your company says, "Yeah, we have what you need. Come and pick it up." It is not sodium tripolyphosphate that is suitable to put on shrimp, then you represented to them; have you not?

A. As long as that's the exact scenerio [sic], yes, sir.

From the standpoint of the evidence, there was simply no issue joined as to $88,508.50 as the damages to Quality. We find as a matter of law that the plaintiff proved the correct amount of damages in the sum of $88,508.50.

The record positively reflects that the bags of sodium were not labeled either food grade or industrial grade. The jury could have certainly considered (and by the verdict did so consider) this fact to the effect that the seller of the same, Van Waters, should have verbally warned the purchaser that the bags were not properly labeled. The bags contained no relevant labels. Hence, the seller should have advised the purchaser of which type of sodium was being sold to the purchaser, who in turn was going to use it as a preservative on shrimp for human food.

The jury could have considered this lack of labeling and warning on the part of the seller to be wrongful. In fact, the jury in supplementing its answer to Question No. 1 wrote: "Incompetence on both sides, but Van Waters & Rogers, Inc. were told the product was to go *on* shrimp. Quality Fish Company was negligent because they did not *ever* check the containers within a two year period (emphasis theirs)". However, the recovery and judgment were not based on the negligence theory.

The jury also found that Van Waters engaged in false, misleading or deceptive acts or practices that were a producing cause of damages to Quality. The Texas Deceptive Trade Practices Act formed the basis of Quality's recovery. The court charged the jury and defined false, misleading and deceptive acts or practices as follows:

"False, misleading or deceptive act or practice" means any of the following:

—representing that goods or services had or would have characteristics, sponsorship, approval, ingredients, uses, benefits or quantities that they did not have; or,

—representing that goods or services are or will be of a particular standard or grade if they were of another; or,

—representing that an agreement confers or involves rights that it did not have or involve.

Answer "Yes" or "No"

Answer: _yes_

The jury answered Question No. 4 which read:

Did Van Waters & Rogers, Inc. fail to comply with the agreement to provide the appropriate type of sodium tripolyphosphate?

Answer "Yes" or "No".

Answer: _yes_

The record shows this: that the defense proved by deposition testimony that the employees of Quality thought that all of the sodium tripolyphosphate was food grade quality. Hence, this misinformation was taken as true and correct by all of the employees at Quality who were using or handling the sodium tripolyphosphate.

One of the Quality employees testified that he had also handled and ordered a certain type of grease for the peeling machine—this being a peeling machine for the shrimp—and this employee knew that the grease was of food grade quality and from his information this same employee also stated that he made sure that the preservative was represented to be food grade. In fact, this employee reiterated that it was his understanding that at all times that if there was anything added ᵗo the shrimp that any of these preservatives or additives had to be and were of food grade quality.

The record reflects that Ms. Lee, the State of Texas inspector with 11-½ years experience with the State Department of Health was asked a number of questions, the following being typical:

Q. Well, let me ask you this: If I came to you and I said, "Ms. Lee, my name is Ethan Shaw, and I work at Quality fish, and I need a sodium tripolyphosphate to put on to some shrimp," would you be able to safely conclude in your own mind that we needed food grade sodium tripolyphosphate?

A. Yes.

Q. There's not any dispute about that, is there?

A. No.

Appellant's postjudgment motions do not raise factual insufficiency issues. When the party having the burden of proof appeals from an adverse fact-finding, the point of error to be correct must argue that the matter or issue in dispute was established as a matter of law in that party's favor. *See O'Neil v. Mack Trucks, Inc.*, 542 S.W.2d 112 (Tex.1976). A complaint by the party with the burden of proof that there was no evidence to support the jury finding invokes the appellate jurisdiction to consider the contention that the opposite of the finding was established as a matter of law. *Id.* Under this record we find that the $88,508.50 was established as a matter of law because the evidence of that vital fact was conclusively proved and the evidence establishes conclusively the damages to be $88,508.50 on that element of damage. *See and compare Croucher v. Croucher*, 660 S.W.2d 55 (Tex. 1983).

Under this record we determine that the evidence establishes conclusively and as a matter of law that the jury finding was clearly wrong and that the evidence establishes and proves conclusively that the damages on the relevant element of damage amounts to $88,508.50. *See and compare* Robert W. Calvert *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 Tex.L.Rev. 361, 362–363 (1960). *See also and compare In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660, 661–662 (1951).

The $88,508.50 damage issue was established and proved as a matter of law because the evidence proved the truth of that exact figure conclusively inasmuch as reasonable persons could not have differed. 4 McDonald Tex.Civ.Prac. § 21.52 (rev. 1992).

The correct rule is generally and appropriately stated that if reasonable minds cannot differ from the evidence presented then that fact issue or matter is established conclusively and as a matter of law.

We hold that the trial judge committed no error in overruling the appellant's post-judgment motions. Consistent with the reasoning above, we overrule each of the appellant's points of error.

Finding no error in the trial court's judgment, we affirm the judgment below.

AFFIRMED.