**COLDWELL BANKER WHITESIDE ASSOCIATES, Appellant/Cross–Appellee,**

v.

**RYAN EQUITY PARTNERS, LTD., Appellee/Cross–Appellant.**

**Ryan Equity Partners, Ltd., Appellant,**

v.

**Jeanette Sadler and James Williams, Appellees.**

No. 05–03–01571–CV.

Court of Appeals of Texas, Dallas.

Jan. 9, 2006.

Robert A. Miller, Prager & Miller, P.C., Dallas, Catherine Kays, Geary Porter & Donavan, P.C., Addison, for Appellant.

Joyce W. Lindauer, Dallas, for Appellee.

Before Justices MORRIS, MOSELEY, and FITZGERALD.

## OPINION

Opinion by Justice FITZGERALD.

This case arises out of Ryan Equity Partners, Ltd.'s purchase of real estate from Jeanette Sadler and James Williams. Coldwell Banker Whiteside Associates was Ryan Equity's real estate broker. The trial court found Coldwell Banker liable to Ryan Equity for breach of contract and awarded Ryan Equity damages of $90,000 plus interest and attorney's fees. The trial court found Sadler and Williams were not liable and awarded them their attorney's fees against Ryan Equity. On appeal, Coldwell Banker contends the trial court erred in finding it liable for breach of contract and awarding damages of $90,000, and Ryan Equity contends the award of only $90,000 against Coldwell Banker was

insufficient. Ryan Equity also appeals the take-nothing judgment in favor of Sadler and Williams. We affirm the trial court's judgment.

## FACTUAL BACKGROUND

In 1964, the Parkmont Apartments were built. This Property consisted of a thirty-one-unit apartment building in the Junius Heights neighborhood in east Dallas. At that time, the zoning permitted the construction and operation of multifamily housing projects of that size. In 1972, Sadler and Williams purchased the Property. In about 1978, the area was rezoned to single-family housing, but the zoning permitted existing multifamily uses, including the Property, to continue operating. In 1988, the area was rezoned again, making multifamily housing nonconforming. This zoning change went unrecognized until 1994, when residents petitioned the City to shut down various multifamily housing uses. The Dallas City Council then passed an ordinance creating a Planned Development District (PD) that included the Property. Under the PD, multifamily housing uses larger than six units were prohibited unless they obtained a Special Use Permit. If a property larger than six units failed to obtain a Special Use Permit, then its nonconforming use would be abated by the City's Board of Adjustment on the application of any citizen. "Abatement" of the nonconforming use meant that the nonconforming property would have to become a single-family residence or cease to operate. In 1995, Sadler and Williams applied for a Special Use Permit from the City, but their application was denied. However, they contin-ued to operate the Property as a thirty-one-unit apartment complex, and no one applied to abate the nonconforming use while they owned the Property.

In 1998, Dean Ryan's partnership, Ryan Equity, was looking for an opportunity for quick investment of about $1.5 million from the sale of land in Hawaii.[1] Ryan Equity planned to purchase run-down apartment complexes in east Dallas, rehabilitate them, raise the rents, and leverage the properties to purchase more real estate. Ryan Equity, through Ryan, contracted with Coldwell Banker Whiteside Associates, through John Whiteside, to select suitable properties (the "Brokerage Agreement"). Whiteside was an experienced real estate broker in east Dallas. Whiteside was assisted by Paige Compton, one of his office's real estate agents.

Whiteside proposed the Property as a suitable purchase under Ryan Equity's plan. One of the partners in Ryan Equity asked Whiteside about the zoning, and Whiteside said it was a legal nonconforming use but was grandfathered,[2] which Whiteside explained meant that the Property could continue to be operated as an apartment complex, but if it burned down or was demolished, it could be used only as single-family housing. Ryan Equity made no independent investigation of the zoning, nor did it seek confirmation of Whiteside's representation of the extent to which the Property was grandfathered. Ryan Equity did not ask Sadler and Williams about the zoning, nor did it tell them the intended use of the Property. After looking at the Property and deciding it could be rehabili-

---

1. The partnership planned to reinvest the money in a manner that would avoid federal taxation by following the provisions of 26 U.S.C. § 1031. This statute requires the identification and purchase of real estate within certain time frames.

2. Whiteside and Compton both testified they made no representation about the zoning or grandfathering and that they were unqualified to do so. However, the trial court found they made the representations.

tated according to the plan, Ryan Equity offered to purchase the Property from Sadler and Williams for $470,000.

Sadler and Williams accepted the offer. The contract for the sale of the Property (the "Purchase Contract") stated that the sellers, Sadler and Williams, were "not aware of . . . any material defects to the Property." The sale closed on November 24, 1998. Coldwell Banker received a commission of three percent, or $14,100, for the transaction. Ryan Equity also purchased four other properties in Dallas.

Ryan Equity planned to renovate the Property after renovating one of the other properties, but it planned to use the rental income from the Property to maintain it until the renovations could begin. Ryan Equity, however, was soon cited for the Property's multiple building code violations, and it hired Roger Albright, an attorney specializing in municipal real estate and zoning issues, to represent it before the City. Albright discovered the PD ordinance and determined that unless Ryan Equity obtained a Special Use Permit, the Property would be forced to cease operation as multifamily housing on the application of any citizen to the Board of Adjustment. Ryan and Albright held meetings with the Junius Heights Neighborhood Association to win the neighborhood's support for a Special Use Permit, but the neighborhood refused to support the plan for the Property. An application for abatement of the nonconforming multifamily use of the Property was filed with the Board of Adjustment. Because the Property did not have a legal right to exist as a multifamily-housing use, Ryan Equity was unable to obtain the building permits and financing necessary to repair the major problems with the Property. Ryan Equity incurred fines of over $167,000 for building code violations. The City of Dallas brought two suits, one seeking demolition of the buildings on the Property for building code violations and the other seeking abatement of the nonconforming use of the Property. In June 2001, Ryan Equity settled the suits with the City by agreeing to tear down the apartments in exchange for the City waiving the fines. Ryan Equity demolished the buildings in August 2001. On February 4, 2002, Ryan Equity sold the Property for $285,000, which netted $247,962 after closing costs.

Ryan Equity sued Sadler, Williams, and Coldwell Banker for breach of the duty of good faith and fair dealing, common-law and statutory fraud, and breach of contract. Ryan Equity also sued Coldwell Banker for breach of fiduciary duty. Following a trial before the court, the trial court found Sadler and Williams were not liable and found Coldwell Banker liable only for breach of contract. The trial court determined that Ryan Equity proved actual damages of $90,000.

Coldwell Banker appeals the trial court's judgment against it for breach of the Brokerage Agreement. Ryan Equity appeals the trial court's failure to determine that Sadler and Williams breached the Purchase Contract and that both Coldwell Banker and Sadler and Williams committed fraud. Ryan Equity also appeals the trial court's award of only $90,000 damages against Coldwell Banker on its breach-of-contract claim.

## STANDARD OF REVIEW

Findings of fact in a case tried to the court have the same force and effect as a jury's verdict on special issues. *Anderson v. City of Seven Points*, 806 S.W.2d 791, 794 (Tex.1991); *Lewis v. Dallas Soundstage, Inc.*, 167 S.W.3d 906, 912 (Tex.App.-Dallas 2005, no pet.). We review the trial court's findings of fact by the same standards that are applied in reviewing the evidence supporting a jury's answers.

*Anderson,* 806 S.W.2d at 794. In reviewing the legal sufficiency of a finding of fact, we consider only the evidence and inferences that support the challenged finding and disregard all contrary evidence and inferences unless the evidence could not be rejected by the fact finder. *City of Keller v. Wilson,* 168 S.W.3d 802, 827 (Tex.2005). We uphold the trial court's finding against a legal sufficiency challenge if there is any probative evidence to support the finding. *Anderson,* 806 S.W.2d at 795. In reviewing a factual sufficiency point of error, we consider all of the evidence. A finding will be set aside only if the evidence is so weak or the finding is so against the great weight and preponderance of the evidence that it is wrong and manifestly unjust. *Lewis,* 167 S.W.3d at 912; *Sierad v. Barnett,* 164 S.W.3d 471, 477 (Tex.App.-Dallas 2005, no pet.). In so doing, we do not pass on the witnesses' credibility or substitute our judgment for that of the trier of fact. *Jakab v. Gran Villa Townhouses Homeowners Ass'n, Inc.,* 149 S.W.3d 863, 866 (Tex.App.-Dallas 2004, no pet.). In addition, the trial court, as fact finder, is the sole judge of the credibility of the witnesses and may accept or reject all or any part of a witness's testimony. *Lisanti v. Dixon,* 147 S.W.3d 638, 642 (Tex.App.-Dallas 2004, pet. denied); *Sw. Bell Media, Inc. v. Lyles,* 825 S.W.2d 488, 493 (Tex.App.-Houston [1st Dist.] 1992, writ denied).

We review challenges to a trial court's conclusions of law as a matter of law. *Lewis,* 167 S.W.3d at 912; *Boyd v. Diversified Fin. Sys.,* 1 S.W.3d 888, 890 (Tex.App.-Dallas 1999, no pet.). We independently evaluate the trial court's conclusions of law, and we give limited deference to a trial court's application of law to facts. *Padilla v. Flying J, Inc.,* 119 S.W.3d 911, 913 (Tex.App.-Dallas 2003, no pet.). The trial court abuses its discretion when it misapplies the law. *Id.*

## RYAN EQUITY V. SADLER AND WILLIAMS

In its first and second issues, Ryan Equity asserts the trial court erred in finding and concluding that Sadler and Williams had not breached the Purchase Contract and had not defrauded Ryan Equity.

### Breach of Contract

In its first issue, Ryan Equity challenges the trial court's finding and conclusion that Sadler and Williams did not breach the Purchase Contract. Ryan Equity argues that Sadler and Williams breached two provisions in the Purchase Contract by failing to disclose: (1) the status of the zoning, that the operation of the apartment complex was subject to being shut down on the application of any citizen to the Board of Adjustment, and (2) the denial of Sadler and Williams's application for a Special Use Permit.

### *Material Defects to the Property*

■ Paragraph 18(b)(i) of the Purchase Contract provided, "To the best of Seller's knowledge and belief ... Seller is not aware of (i) any material defects to the Property." Ryan Equity contends "the nondisclosure of the status of the zoning and the denial of the SUP [Special Use Permit] was [sic] the nondisclosure of *material defects* with the Property." The trial court concluded, "The status of the Property's zoning does not constitute a 'material defect' under the terms of the Contract."

■ Whether nonconformance to zoning ordinances constitutes a "material defect" requiring disclosure under a real estate contract is an issue of first impression in Texas. The term "material defect" is not defined in the Purchase Contract. Nor is it defined in the statutes governing the

sale of real property.[3] We give terms their plain, ordinary, and generally accepted meaning when they are not defined specifically in the contract or the law. *See Travelers Indem. Co. v. Starkey*, 157 S.W.3d 899, 906 (Tex.App.-Dallas 2005, pet. denied). Our specific inquiry concerns the ordinary meaning of "defect" as that word is used in the contractual phrase "defect to the Property." A "defect" is "an irregularity in a surface or a structure that spoils the appearance or causes weakness or failure." WEBSTER's THIRD NEW INT'L DICTIONARY 591 (1981). Thus, a "defect to the Property" would be some irregularity in "a surface or a structure" of the Property that mars its appearance or causes some aspect of the Property to weaken or fail. *See id.* The definition addresses tangible aspects of the Property, whether its physical appearance or its physical structure. This definition is in line with the plain understanding and usage of the term: when we call something defective, we mean it is blemished, broken, deficient, or imperfect in some physical sense.

Given this plain understanding of the language at issue, we conclude that the zoning status of the Property was not a material defect to the Property within the meaning of the Purchase Contract. Zoning laws neither cause nor result from physical imperfections or deficiencies in real property itself. The zoning law at issue does not relate to the exact physical condition of the Property. Instead, the zoning law regulates the use of the Property, giving it a discernible legal status. The denial of Sadler and Williams's application for a Special Use Permit was a determination of the Property's legal status pursuant to the zoning ordinance, not a "material defect[ ] to the Property."

Finally, having concluded the zoning information related to legal status and not to any defective condition on the Property, we address whether that legal status nonetheless had to be disclosed by Sadler and Williams. Ryan Equity contends Sadler and Williams had the duty to inform it of the zoning laws and to interpret the effect of those laws for it. Ryan Equity cites no authority for the proposition that a seller of commercial real estate has a duty to identify the applicable zoning laws or explain their effect to a sophisticated, experienced real estate investor who makes no inquiry to the seller of the zoning status and receives no express representation from the seller of the zoning status. "Courts presume the parties to a contract knew and took into consideration the laws affecting matters about which they contracted, unless the contrary clearly appears in the terms of the contract." *Colo. Interstate Gas Co. v. Hunt Energy Corp.*, 47 S.W.3d 1, 8 (Tex.App.-Amarillo 2000, pet. denied). Because we presume the parties knew the law affecting the Property, we conclude Sadler and Williams had no duty to disclose and explain the law to sophisticated real estate investors like the principals of Ryan Equity.

The trial court correctly found and concluded that Sadler and Williams did not breach the Purchase Contract by failing to disclose material defects to the Property.

### Conditions Violating Local Statutes

Ryan Equity asserts Sadler and Williams violated section 18(b)(ii) of the Purchase Contract by failing to disclose the zoning status and the denial of their

---

**3.** Ryan Equity cites one case, but it concerns fraud, not breach of a contractual provision requiring disclosure of "material defects to the Property." *See NRC, Inc. v. Pickhardt,* 667 S.W.2d 292 (Tex.App.-Texarkana 1984, writ ref'd n.r.e.). We conclude it offers no assistance on this issue.

application for a Special Use Permit. Paragraph 18(b)(ii) provides,

To the best of Seller's knowledge and belief ... Seller is not aware of ...

(ii) any environmental hazards or conditions affecting the Property which would violate any federal, state or local statutes, regulations, ordinances or other requirements and more specifically, but without limitation, whether (1) the Property is or has ever been used for the storage or disposal of hazardous substances or materials or toxic waste, a dump site or landfill or the housing of any underground tanks or drums; (2) radon, asbestos insulation or fireproofing, unreaformaldehyde foam insulation, lead-based paint or other pollutants or contaminants of any nature now exist or have existed on the Property; (3) wetlands, as defined by federal or state law or regulation are on the Property; and (4) threatened or endangered species or their habitat, as defined by the Texas Parks and Wildlife Department or the U.S. Fish and Wildlife Service are on the Property.

Ryan Equity argues this provision should be read, "To the best of Seller's knowledge and belief ... Seller is not aware of ... conditions affecting the Property which would violate any federal, state or local statutes, regulations, ordinances or other requirements." Sadler and Williams argue this condensing of the provision changes its intended meaning by removing it from its environmental context.

In construing Sadler and Williams's obligations under the Purchase Contract, our primary concern is to ascertain and give effect to the intentions of the parties as expressed in their agreement. *Kelley–Coppedge, Inc. v. Highlands Ins. Co.*, 980 S.W.2d 462, 464 (Tex.1998). To ascertain the parties' true intentions, we examine the entire agreement in an effort to harmonize and give effect to all of the provisions of the contract so that none will be rendered meaningless. *MCI Telecomms. Corp. v. Tex. Utils. Elec. Co.*, 995 S.W.2d 647, 652 (Tex.1999). When a written contract is so worded that it can be given a certain or definite legal meaning or interpretation, it is not ambiguous, and courts construe it as a matter of law. *Am. Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 157 (Tex.2003).

Reading the entire paragraph 18(b)(ii), which concerns compliance with environmental regulations, we conclude the provision constituted a declaration by Sadler and Williams that the Property was in compliance with all *environmental* statutes, laws, ordinances, and regulations; it was not a declaration that the Property was in compliance with all zoning statutes, laws, ordinances, and regulations for the types of appropriate housing. The trial court did not err in determining Sadler and Williams did not violate this provision by failing to disclose the zoning status and the denial of their application for a Special Use Permit.

We hold the trial court did not err in concluding Sadler and Williams did not breach the Purchase Contract. We overrule Ryan Equity's first issue.

### Fraud

In its second issue, Ryan Equity contends the trial court erred in concluding Sadler and Williams did not commit fraud against it.

 For common-law fraud, the plaintiff must prove (1) a material misrepresentation; (2) that was false when made; (3) that was known by the speaker to be false when it was made or that was made recklessly as a positive assertion without knowledge of its truth; (4) the speaker

made it with the intent that it should be acted upon; (5) the party justifiably relied on the representation; and (6) the party was injured as a result. *See Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co.,* 51 S.W.3d 573, 577 (Tex.2001).

■ To prove statutory fraud in a real estate transaction, a plaintiff must show: (1) a false representation of a past or existing material fact, when the false representation is (A) made to a person for the purpose of inducing the person to enter into a contract and (B) relied on by that person in entering into that contract; or (2) a false promise to do an act, when the false promise is (A) material, (B) made with the intention of not fulfilling it, (C) made to a person for the purpose of inducing that person to enter into a contract, and (D) relied on by that person in entering into that contract. TEX. BUS. & COM. CODE ANN. § 27.01(a) (Vernon 2002). Like common-law fraud, the plaintiff's reliance in statutory fraud must be justifiable. *TCA Bldg. Co. v. Entech, Inc.,* 86 S.W.3d 667, 674 (Tex.App.-Austin 2002, no pet.).

■ A misrepresentation may consist of the concealment or nondisclosure of a material fact when there is a duty to disclose. *Custom Leasing, Inc. v. Tex. Bank & Trust Co.,* 516 S.W.2d 138, 142 (Tex. 1974); *Miller v. Kennedy & Minshew, P.C.,* 142 S.W.3d 325, 345 (Tex.App.-Fort Worth 2003, pet. denied). The duty to disclose arises when one party knows that the other party is ignorant of the true facts and does not have an equal opportunity to discover the truth. *Miller,* 142 S.W.3d at 345. A fact is material if it would likely affect the conduct of a reasonable person concerning the transaction in question. *Custom Leasing, Inc.,* 516 S.W.2d at 142; *Miller,* 142 S.W.3d at 345.

■ It is undisputed that Sadler and Williams did not discuss the zoning or Special Use Permits with Ryan Equity's principals and made no affirmative representations regarding the zoning. Thus, their liability for fraud depends on their having a duty to disclose those facts. A seller of real estate is under a duty to disclose any material fact that would be not be discoverable by the purchaser's exercise of ordinary care and diligence or which a reasonable investigation would not uncover. *Smith v. Nat'l Resort Communities, Inc.,* 585 S.W.2d 655, 658 (Tex. 1979); *Robbins v. Capozzi,* 100 S.W.3d 18, 24 (Tex.App.-Tyler 2002, no pet.). Ryan Equity does not explain why the zoning status and denial of the application for the Special Use Permit were not discoverable through the exercise of ordinary care, reasonable diligence, or a reasonable investigation.

Albright testified that he discovered the zoning status and the denial of the application for the Special Use Permit through examining the publicly available zoning records at City Hall. No witness testified that these records were not discoverable through a reasonable investigation. Albright's testimony did not indicate his investigation that discovered the facts was unreasonable or went beyond the exercise of ordinary care and reasonable diligence.

The trial court made no express finding on this element of whether the undisclosed facts were discoverable through the exercise of ordinary care, reasonable diligence, or through a reasonable investigation. However, when a trial court has made other fact findings on elements of a cause of action, findings on omitted elements may be supplied by presumption in support of the judgment when those facts are supported by evidence. TEX.R. CIV. P. 299. In this case, the trial court made findings on the fraud causes of action, and the element of the reasonable discoverability of the undisclosed facts was supported by

Albright's testimony. Accordingly, we presume the trial court found the undisclosed facts were discoverable through a reasonable investigation and that Sadler and Williams had no duty to disclose those facts.

 Because Sadler and Williams had no duty to disclose the facts, their failure to do so was not fraud. We hold the trial court did not err in concluding Sadler and Williams did not defraud Ryan Equity.[4] We overrule Ryan Equity's second issue.

## COLDWELL BANKER V. RYAN EQUITY

Coldwell Banker brings five points of error contending (1) the trial court erred in concluding it breached its Brokerage Agreement with Ryan Equity; (2) certain findings of fact are not supported by legally and factually sufficient evidence; (3, 4) the trial court erred in awarding attorney's fees to Ryan Equity and not to Coldwell Banker; and (5) the trial court erred in not finding certain requested findings of fact. Ryan Equity brings two issues asserting the trial court erred in determining Coldwell Banker did not defraud Ryan Equity and by failing to award Ryan Equity the full amount of actual damages it incurred due to Coldwell Banker's breach of contract.

### Breach of Contract

In its first point of error, Coldwell Banker contends the trial court erred in concluding it breached its Brokerage Agreement with Ryan Equity. In the second point of error, Coldwell Banker contends there is no evidence or insufficient evi-

dence to support various findings of fact and conclusions of law, including those concerning Coldwell Banker's liability for breach of contract.

Ryan Equity's petition alleged Coldwell Banker breached its contract with it by (1) representing "there were no material defects with respect to the Property when in fact there was a huge defect with the Property," and (2) representing "that the Property was in compliance with applicable local ordinances and laws when it was not." The trial court's judgment decrees that Ryan Equity "shall recover judgment against [Coldwell Banker] only on its claim of breach of contract in the amount of $90,000."

### *Material Defects to the Property*

 The Brokerage Agreement provided, "Broker is obliged to disclose any material defect in a property known to Broker." We concluded above that the zoning status and denial of the application for a Special Use Permit were not "material defects" to the Property within the meaning of the Purchase Contract. Our analysis is no different under the Brokerage Agreement. Accordingly, we conclude no evidence supports the allegation that Coldwell Banker's failure to disclose either the zoning status of the Property or the earlier denial of the application for a Special Use Permit was a breach of the Brokerage Agreement.

### *Compliance With Local Ordinances and Laws*

 Ryan Equity's second allegation of breach stated that Coldwell Banker had

---

4. We make no holding regarding whether a commercial property owner's failure to disclose that a citizen had applied for abatement of the property's nonconforming use or any other fact situation other than the failure to disclose the existence of the PD and its effect on the Property and the failure to disclose the denial of the application for a Special Use Permit would constitute breach of contract or fraud. We also make no holding regarding the disclosure duties of a seller of noncommercial property.

represented "that the Property was in compliance with applicable local ordinances and laws." The specific compliance at issue concerned the PD and zoning ordinances that governed usage of the Property. The language quoted above is found in the Purchase Contract, not in the Brokerage Agreement. Coldwell Banker was not a party to the Purchase Contract, and our review of the record located no evidence that Coldwell Banker, through its employees Whiteside and Compton, made this representation in these precise words. Instead, our review of the record indicates this issue was tried with a focus on the representation by Whiteside and Compton that the Property was a "legal nonconforming use" and that the Property had been "grandfathered." Ryan Equity's witnesses testified that Whiteside and Compton made this representation; Whiteside and Compton denied making it. The trial court found the representation was made, and we will not disturb its credibility determination. *See Jakab*, 149 S.W.3d at 866.

At trial, the parties offered different explanations for the meanings of "legal nonconforming" and "grandfathered." There was testimony that the terms were equivalent: that zoning changes would make a property's usage nonconforming, but that through grandfathering the property would be excepted from the zoning change. Thus, according to witnesses, if a property had been grandfathered, it could legally continue its nonconforming usage. We conclude this testimony is in accord with the plain meaning and general understanding of these terms.

Our review of the record yields no evidence that the Property had in fact been grandfathered, or excepted from the zoning requirements of the PD. Yet Ryan Equity's witnesses testified repeatedly at trial that Whiteside and Compton told

them, in effect, "the property was grandfathered and everything was fine." The trial court concluded that "Coldwell breached its contract with [Ryan Equity] by failing to disclose the actual fact that the Property was subject to being slated for demolition at the time of [Ryan Equity's] purchase of the Property." Although demolition was not the inevitable end for this Property, it was a possible result of its zoning status. When Whiteside and Compton represented to Ryan Equity that the Property was grandfathered, they gave an incorrect evaluation of the status of the Property. We find no directive within the Brokerage Agreement requiring Coldwell Banker to identify the effects of the zoning status of the Property. However, once the broker undertook to identify those effects, it had an obligation to do so correctly.

Coldwell Banker also argues its liability is prohibited by section 1101.805(e) of the Texas Occupations Code, which provides:

A license holder [broker] is not liable for a misrepresentation or a concealment of a material fact made by a party [prospective buyer or seller] to a real estate transaction unless the license holder:

(1) knew of the falsity of the misrepresentation or concealment; and

(2) failed to disclose the license holder's knowledge of the falsity of the misrepresentation or concealment.

Tex. Occ.Code Ann. § 1101.805(e) (Vernon 2004); *see also id.* §§ 1101.002(4) (defining "license holder"); 1101.551(2) (defining "party"). Coldwell Banker's reliance on this provision is misplaced for two reasons. First, Coldwell Banker did not plead this affirmative defense. Affirmative defenses not pleaded are waived unless tried by consent, and Coldwell Banker does not assert the defense was tried by consent. *See* Tex.R. Civ. P. 67, 94; *Compass Bank*

*v. MFP Fin. Servs., Inc.*, 152 S.W.3d 844, 851 (Tex.App.-Dallas 2005, pet. denied). Second, even if not waived, this defense does not apply because Coldwell Banker was found liable for its representations that the Property was grandfathered and could be operated as an apartment complex until the buildings were demolished. Coldwell Banker's liability was not based upon Sadler and Williams's failure to disclose the legal status of the Property.

We conclude the evidence is sufficient to support the trial court's determination that Coldwell Banker breached its Brokerage Agreement with Ryan Equity. We further conclude there is sufficient evidentiary support for the trial court's findings that underlie this breach-of-contract determination and the resultant award of attorney's fees. Accordingly, we overrule Coldwell Banker's first point of error, and we overrule its second point of error to the extent it concerns the findings of fact and conclusions of law of Coldwell Banker's liability for breach of contract.

### Damages

The trial court awarded Ryan Equity $90,000 damages on its breach-of-contract cause of action against Coldwell Banker. In the second point of error, Coldwell Banker also contends there is no evidence or insufficient evidence to support the trial court's finding or conclusion that Ryan Equity is entitled to $90,000 damages for

Coldwell Banker's breach of contract. The trial court did not state the basis for the award of $90,000 damages for Coldwell Banker's breach of contract.[5]

Ryan Equity presented its damages evidence through Peter Malin. Malin calculated Ryan Equity's damages under two different approaches, (1) actual expenditures and lost time value of its investment and (2) lost profits. On the actual-expenditures-and-lost-time-value damages, Malin combined the following values:

| Amount Paid for Property 9/98 | ($486,160) |
|---|---|
| Carrying Cost | 30,585 |
| Demolition Cost | ( 45,138) |
| Sale of Property | 247,962 |
| Time Value of Money [9.38%] | ( 188,603) |
| Damages | ($441,354) |

For the lost-profit damages, Malin estimated the costs of renovation and made conservative and optimistic estimations of income Ryan Equity would have received had it been able to proceed with its plan for renovating the Property and leasing it with increased rents. Malin's conservative estimate of lost-profit damages was $366,391, his optimistic estimate was $582,591, and the midpoint between these was $474,491. Malin then "reconciled" these two approaches to damages "coming up with an estimate of damages" of $450,000.

■ "The universal rule for measuring damages for the breach of a contract is just compensation for the loss or damage

---

**5.** $90,000 is six percent of $1.5 million. The copy in the record of the executed Brokerage Agreement between Ryan Equity and Coldwell Banker is of poor quality. A blank copy of the form contract was also admitted. Examining both the poor-quality copy of the executed contract and the higher-quality copy of the blank contract, it appears Ryan Equity agreed to pay Coldwell Banker a fee of some percentage of the gross purchase price of the property, less whatever was paid by the seller. The exact percentage promised may be six percent, but because of the low-quality of the

copy, we cannot be certain. No witness testified what percentage was promised. If the trial court awarded $90,000 based on that amount being the total commission received by Coldwell Banker for all of Ryan Equity's land purchases, then that amount is not supported by the evidence or findings. No evidence shows what commission Coldwell Banker received on the other properties, and the trial court found that Coldwell Banker's commission on Ryan Equity's purchase of the Property was only three percent.

actually sustained." *Qaddura v. Indo–European Foods, Inc.*, 141 S.W.3d 882, 888 (Tex.App.-Dallas 2004, pet. denied).

Coldwell Banker asserts that damages from lost profits are consequential damages, which cannot be recovered unless pleaded. Coldwell Banker concludes that because Ryan Equity did not plead lost profits in its breach of contract cause of action, it cannot recover them. *See Boat Superstore, Inc. v. Haner*, 877 S.W.2d 376, 379 (Tex.App.-Houston [1st Dist.] 1994, no writ) (setting aside award of "credit damages" because not specifically pleaded). Coldwell Banker also argues that Malin's testimony is too speculative to support an award of damages for lost profits.

■ Regardless of whether Ryan Equity can recover lost profits, it presented evidence through Malin of an alternative measure of damages, its actual cost of holding and disposing of the Property plus the lost time-value of its investment. Coldwell Banker's arguments on appeal, however, do not challenge Malin's testimony about this approach to damages calculation. Malin testified that these damages exceed $90,000. Because the damages are supported by Malin's unchallenged testimony on this approach to calculating damages, we need not consider whether Ryan Equity sufficiently pleaded and proved evi-

dence of lost profits. *See Westcliffe, Inc. v. Bear Creek Constr., Ltd.*, 105 S.W.3d 286, 293–94 (Tex.App.-Dallas 2003, no pet.). We overrule Coldwell Banker's second point of error.

■ In its fourth issue, Ryan Equity asserts the trial court "erred in failing to award the full amount of actual damages incurred by [Ryan Equity] against [Coldwell Banker] as a result of their [sic] breach of contract." Ryan Equity argues it proved its damages were between $277,249 and $697,249, based on the cash value and replacement value of the Property as determined by Sadler and Williams's insurer.[6] It also asserts Malin's testimony proved its damages were between $366,391 and $582,591. Ryan Equity then requests that we "increase the award of damages against [Coldwell Banker] as set forth herein based on the evidence of actual damages presented to the [trial] [c]ourt." In its reply brief, Ryan Equity states Malin's testimony proved it "suffered damages in the amount of $450,000 and this is the amount that should have been found by the District Court," and it again asks us to "increase the award of damages." We construe Ryan Equity's arguments as requesting us to modify the judgment to provide damages of $450,000.[7] We cannot provide Ryan Equity that relief.

6. Ryan Equity offered into evidence a letter from Sadler and Williams's insurer, which stated the "actual cash value" of the building on the Property was $530,000 and the "replacement cost" of the building was $950,000. In its brief, Ryan Equity states these figures are for "the Property." Ryan Equity states, "Taking either of these values less the amount realized from a subsequent sale of the Property, which is $252,751, would place the difference lost at between $277,249 and $697,249." The amount Ryan Equity realized on the sale of the Property was $247,962, not $252,751. According to Malin's testimony, $252,751 was the "cash out" loss calculated by combining the purchase price with Ryan Equity's closing costs, the

holding costs, the demolition cost, and the amount realized from the sale.

7. Ryan Equity does not argue for or request a remand for new trial on the breach-of-contract cause of action. It does not expressly argue that the damages are against the great weight and preponderance of the evidence, which could entitle it (and also Coldwell Banker) to a new trial on the breach-of-contract cause of action. *See* Tex.R.App. P. 44.1(b) ("The court may not order a separate trial solely on unliquidated damages if liability is contested."). We do not construe Ryan Equity's briefing as implicitly asserting the damages were against the great weight and preponderance of the evidence.

■ Ryan Equity cites no authority for the relief it requests, nor does it even set forth a standard of review. Accordingly, it has not properly briefed this issue. *See* Tex.R.App. P. 38.1(h); *LaCroix v. Simpson,* 148 S.W.3d 731, 735–36 (Tex.App.-Dallas 2004, no pet.).

■ If the issue were properly briefed, Ryan Equity, as a party attempting to overcome an adverse fact finding to an issue on which it had the burden of proof, would have to surmount two hurdles. *See Park Cities Ltd. P'ship v. Transp. Funding Corp.,* 131 S.W.3d 654, 660 (Tex.App.-Dallas 2004, pet. denied). First, the reviewing court must examine the record for evidence supporting the finding or failure to find, while ignoring all evidence to the contrary. *Id.* Second, if there is no evidence to support the finding or failure to find, the reviewing court will then examine the entire record to determine whether the contrary proposition is established as a matter of law. *Id.*

■ Even if all the evidence on damages shows Ryan Equity's damages exceeded $90,000, we cannot change the trial court's judgment to a higher damages amount unless Ryan Equity proved that exact amount as a matter of law. *See Van Waters & Rogers, Inc. v. Quality Freezers, Inc.,* 873 S.W.2d 460, 466 (Tex.App.-Beaumont 1994, writ denied); *see also Oyster Creek Fin. Corp. v. Richwood Inv. II, Inc.,* 176 S.W.3d 307, 325 (Tex.App.-Houston [1st Dist.] 2004, pet. denied) (rules of procedure do not provide for additur to increase award of disputed damages); *Ponce v. Sandoval,* 68 S.W.3d 799, 805 (Tex.App.-Amarillo 2001, no pet.) (same). A fact is established as a matter of law when reasonable minds could not differ concerning the existence of the fact. *Van Waters & Rogers, Inc.,* 873 S.W.2d at 467. Ryan Equity asserts Malin testified that $450,000 was an appropriate damages amount. However, Malin testified he calculated a range of damages, not an exact amount, and that the $450,000 amount was a reconciliation of two different approaches to damages calculation. Accordingly, reasonable minds could differ as to the exact amount of Ryan Equity's damages. Because the amount of damages was not proven as a matter of law, we cannot modify the judgment to assess damages at any particular amount. *Cf. id.* at 466 ("The $88,508.50 damage issue was established and proved as a matter of law because the evidence proved the truth of that exact figure conclusively inasmuch as reasonable persons could not have differed."). We overrule Ryan Equity's fourth issue.

### Attorney's Fees

In its third and fourth points of error, Coldwell Banker contends the trial court erred in awarding Ryan Equity attorney's fees and in not awarding Coldwell Banker its attorney's fees. Both points of error are premised on Coldwell Banker's prevailing on its assertions that it did not breach the contract or that Ryan Equity did not prove its damages. Because Coldwell Banker did not prevail on these assertions, its arguments lack merit. We overrule its third and fourth points of error.

### Failure to Make Requested Findings of Fact

In its fifth point of error, Coldwell Banker asserts the trial court erred in failing to find some of Coldwell Banker's requested findings of fact. Under rule of civil procedure 298, a party may request the trial court to make additional or amended findings of fact and conclusions of law. *See* Tex.R. Civ. P. 298. The court may make such additional findings as "are appropriate." *Id.*

Coldwell Banker first asserts the trial court erred in not making a finding relevant to the two-year statute of limitations. Any error in not making this finding is not reversible because the trial court did not hold against Coldwell Banker on any cause of action with a two-year limitations period, and Ryan Equity has not challenged the adverse judgment on any such cause of action. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 16.004(a)(3), (4) (Vernon 2003) (four-year limitations period for suit for debt and fraud); *Morriss v. Enron Oil & Gas Co.*, 948 S.W.2d 858, 869 (Tex.App.-San Antonio 1997, no writ) (four-year limitations period for breach of contract); *see also* TEX.R.APP. P. 44.1(a) (error not reversible unless it probably caused rendition of improper judgment).

Coldwell Banker asserts the trial court should have found Sadler and Williams did not disclose to Whiteside, Compton, or Ryan Equity the denial of its application for an SUP and that Whiteside and Compton had no knowledge of the application for and denial of the SUP. Coldwell Banker argues these requested findings are relevant because, under the Occupations Code, brokers are not liable for sellers' failure to disclose. These requested findings are not relevant because, as discussed above, Coldwell Banker's liability was based on its own actions and inactions, not Sadler and Williams's failure to disclose.

Coldwell Banker asserts the trial court should have found "[Ryan Equity] retained its own expert, Bob Deaver, an attorney, who did the due diligence for Plaintiff." Coldwell Banker argues this requested finding was necessary because "[Ryan Equity] did not charge [Coldwell Banker] with the obligation to look into zoning. There is no producing cause." (Citations omitted.) This finding is irrelevant because Coldwell Banker's liability was not dependent upon being "charge[d] ... with

the obligation to look into zoning." Coldwell Banker does not explain how this finding would prevent its breach of contract from causing Ryan Equity's damages.

Coldwell Banker asserts the trial court should have found Dean Ryan and Al Rabelais made statements in affidavits regarding the location at which a conversation took place that they later withdrew and that their testimony is not trustworthy. The credibility of witnesses is a matter entrusted solely to the trier of fact. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex.2003); *Mayhew v. Dealey*, 143 S.W.3d 356, 367 (Tex.App.-Dallas 2004, pet. denied). It appears the trial court determined the testimony of Ryan and Rabelais was credible, and we cannot set aside that determination.

Coldwell Banker asserts the trial court should have found Ryan Equity "was more than 51% responsible for damages, if any." Coldwell Banker presents no argument supporting this assertion. Accordingly, it is not adequately briefed. TEX. R.APP. P. 38.1(h); *LaCroix*, 148 S.W.3d at 735–36.

We overrule Coldwell Banker's fifth point of error.

### *Fraud*

In its third issue, Ryan Equity asserts the trial court erred in finding and concluding that Coldwell Banker did not defraud it. Ryan Equity brought causes of action for both common-law and statutory fraud.

Ryan Equity pleaded Coldwell Banker defrauded it by (1) representing that the Property, although a legal nonconforming use, was not subject to demolition and (2) failing to disclose the facts that the Property was subject to demolition and that Sadler and Williams had been denied a

Special Use Permit. We have concluded the trial court's determination that Coldwell Banker gave incorrect information concerning the effects of the zoning status of the Property was supported by legally and factually sufficient evidence. However, our review of the record does not identify any evidence that Coldwell Banker intentionally misinformed its principal concerning the effect of the zoning or any other matter. Indeed, Ryan Equity's briefing on this issue does not speak to evidence supporting the elements of fraud.[8] Instead, the briefing speaks to the same allegations concerning zoning disclosure that underlie Ryan Equity's breach-of-contract claim. In this case, Coldwell Banker's obligation, if any, to disclose any information relating to the Property arose solely from its Brokerage Agreement with Ryan Equity. We find no evidence in the record to establish the independent tort of fraud. *See Sw. Bell Tel. Co. v. DeLanney,* 809 S.W.2d 493, 495 (Tex.1991).

We conclude the trial court did not err in concluding Ryan Equity could not recover on its fraud claims against Coldwell Banker. We overrule Ryan Equity's third issue.

## CONCLUSION

We affirm the trial court's judgment.

---

8. Ryan Equity's brief does cite to agency law to show various obligations Coldwell Banker owed Ryan Equity as its principal. However, Ryan Equity does not appeal the trial court's denial of its breach-of-fiduciary-duty claim.